# BROWN v. SALT LAKE CITY.

No. 1878. Decided January 9, 1908 (93 Pac. 570).

1. MUNICIPAL CORPORATIONS — PRESENTATION OF CLAIMS — CONDITION PRECEDENT. The presentation to a city of claims against it, when required by statute stipulating that no action shall be brought on a claim against a city unless the same has been presented to the council thereof, is a condition precedent and unless done no recovery can be had.

2. SAME. An action against a city by a mother for the death of her minor son, through the negligence of the city in failing to guard the entrance to a conduit constructed and maintained by it as a part of its waterworks system, is not based on a claim within the statute providing that claims arising out of defective streets, sidewalks, etc., or for negligence of the city with respect thereto, or claims arising out of transactions with the city, shall be presented to the council or no action thereon can be maintained, and the presentation to the city of a claim for damages for the death of the son is not necessary to the maintenance of the action.

3. SAME. The statute providing that claims against a municipality for damages arising from a defective street or sidewalk, or through the negligence of the municipality in respect to any street or sidewalk, shall be presented within a specified time after the happening of such injury or damage, etc., does not include damages for negligent death.

4. SAME—TORTS—EXERCISE OF GOVERNMENTAL POWERS. A city maintaining a waterworks system supplying water to its inhabitants for domestic use at established rates, and furnishing water for fire protection and irrigation free of charge, does not do so in its governmental capacity, though so far as it furnishes water for fire protection it acts in its governmental capacity, and it is liable to the same extent as any private owner would be.[1]

5. SAME. A city maintained a system of waterworks supplying water to its inhabitants for domestic use at fixed rates, and furnishing water for fire protection and irrigation free of charge. It maintained a conduit which was not used in the distribution of water for pay, but it was a part of the system and necessary thereto. The water flowing through the conduit was used for irrigation. *Held*, that the city was liable for an accident occurring in the conduit to the same extent that a private owner would be.

---

[1] *Ogden* v. Waterworks & Irrigation Co., 28 Utah 25, 76 Pac. 1069.

6. NEGLIGENCE—USE OF PROPERTY—CARE AS TO PERSONS INVITED. An owner owes the duty of reasonable care for the safety of a person coming on his premises by invitation, express or implied.

7. SAME—TRESPASSERS—PLACES ATTRACTIVE TO CHILDREN. Though an owner need not as against an adult intruder or licensee maintain his premises in a reasonably safe condition, yet he must on placing something on his premises which is easily accessible, and which is alluring to children, exercise reasonable care for their safety.

8. MUNICIPAL CORPORATIONS — NEGLIGENCE — QUESTION FOR JURY. Whether a city failing to guard the entrance into a conduit maintained by it as a part of its waterworks system was negligent and liable for the death of a child passing into the conduit with other children to play, held, under the evidence, for the jury.

9. APPEAL—VERDICT—CONCLUSIVENESS. The Supreme Court can neither disturb a verdict on conflicting evidence which would support a verdict either way, nor where there is doubt as to whether the jury should have found a particular act constituted negligence or otherwise.

10. MUNICIPAL CORPORATIONS—INJURY TO PERSON ON MUNICIPAL PROPERTY—CONTRIBUTORY NEGLIGENCE. In an action by a mother for the negligent death of her minor child about eight years of age, while playing in an unguarded conduit maintained by a city as a part of its waterworks system, the question of the contributory negligence of the mother and the child held, under the evidence, for the jury.

APPEAL from District Court, Third District; T. D. Lewis, Judge.

Action by Lettie A. Brown against Salt Lake City. From a judgment for plaintiff, defendant appeals.

AFFIRMED.

*Ogden Hills* and *H. J. Dininney,* for appellant.

*Dey & Hoppaugh* and *E. A. Walton* for respondent.

APPELLANT'S POINTS.

The statute says, *all* claims for damages or injury must be presented to the city council. (Sec. 312, Laws 1903, p. 12.)
A claim for death of a person must be presented to the

city authorities. (*Taylor* v. *Woburn,* 130 Mass. 494; *Madden* v. *Springfield,* 131 Mass. 441.)

The requirement is reasonable and is mandatory, and a condition precedent to recovery. (*Lincoln* v. *Grant,* 55 N. W. 745; *Dale* v. *Duluth,* 76 N. W. 1029; *Trost* v. *Casselton* [Mich.], 79 N. W. 1071; *Startling* v. *Bedford* [Iowa], 62 N. W. 674; *Hastings* v. *Foxworthy,* 63 N. W. Rep. 955 (Neb.); *Sowle* v. *Tomah* [Wis.], 51 N. W. 571; *Schleicher* v. *Mt. Vernon,* 85 N. Y. 326; *MacMullen* v. *Middleton* [N. Y.], 79 N. E. 863; *Engstrom* v. *Minneapolis,* 78 Minn. 200; *Bausher* v. *St. Paul,* 75 N. W. 745; *Forsythe* v. *Oswego,* 95 N. Y. S. 33; *Postel* v. *Seattle,* 83 Pac. 1025; Cases cited in Vol. 4, Supp. Am. & Eng. Enc'y of Law, p. 120.)

Notice of the claim must be given, and the same alleged and proved to sustain the action. (*Low* v. *Williams,* 75 Me. 113; *Foley* v. *Mayor,* 1 App. Div. 586; *Lincoln* v. *Grant,* 38 Neb. 369; *Olmstead* v. *Pound Ridge,* 71 Hun. 25; *Arthur* v. *Glens Falls,* 66 Hun. 136; *Susengeth* v. *Randout,* 48 Wis. 334; *Wentworth* v. *Simons,* 60 Wis. 381; *Dorsey* v. *Racine,* 60 Wis. 292; *Barrett* v. *Mobile,* 129 Ala. 179; *Columbus* v. *Daniel,* 117 Ga. 823; *Jewell* v. *Ithaca,* 72 App. Div. 220; *Smith* v. *N. Y.,* 88 App. Div. 606; *Silger* v. *N. Y.,* 88 N. Y. S. 1003; *Reining* v. *Buffalo,* 102 N. Y. 308; *MacMullen* v. *Middletown* [N. Y.], 79 N. E. 863; *Sowle* v. *Tomah,* 51 N. W. 571; *Baggs* v. *Geneva,* 90 N. Y. S. 858.)

If not alleged in the complaint it is demurrable. (*O'Donnell* v. *New London* [Wis.], 89 N. W. 512; *Lincoln* v. *Grant, supra; Fenton* v. *Salt Lake County,* 4 Utah 446; *Nothdurft* v. *City of Lincoln,* 105 N. W. 1084.)

In the last case cited the court held that the filing of the notice of claim was jurisdictional. Also (*State* v. *Colleton Co.,* 31 So. Car. 81; *Goldsworthy* v. *Linden* [Wis.], 43 N. W. 655.)

The requirement that a claim be presented within a certain time is a statute of limitation. (*Hay* v. *City of Baraboo* [Wis.], 105 N. W. 654; *Van Auken* v. *Adrian* [Mich.],

98 N. W. 15; *O'Connor* v. *Fond du Lac* [Wis.], 85 N. W. 327.)

Neither a municipal corporation nor any other person is liable for an injury to a trespasser upon its property, and there is no exception to the rule in favor of a child.   (Vol. 1, sec. 803, Smith on Mod. M. C.; *Gray* v. *Railroad* [Mass.], 38 N. E. 186; *Schauf* v. *Paducah* [Ky.], 50 S. W. 42; *Klix* v. *Newman*, 68 Wis. 273; *Gramlick* v. *Wurst*, 86 Pa. 74; *Omaha* v. *Bowman* [Neb.], 72 N. W. 316-318; *Dehantz* v. *St. Paul* [Ill.], 76 N. W. 48-50; *Nutting* v. *St. Paul* [Minn.], 76 N. W. 61; *Barnes* v. *Railroad*, 49 A. S. R. 416; *Walsh* v. *Railroad*, 145 N. Y. 301; *Frost* v. *Railroad*, 64 N. H. 220; *Bates* v. *Railroad*, 90 Tenn. 36; *Daniels* v. *Railroad*, 154 Mass. 349; *Gillespie* v. *McGowan*, 100 Pa. 123; *Hughes* v. *Railroad*, 71 N. H. 279; *Carter* v. *Railroad*, 19 W. Va. 20; *Friedman* v. *Snauctul*, 71 N. J. L. 605, 618; *Railroad* v. *Arnold*, 78 Miss. 787; *McCaughna* v. *Electric Co.*, 129 Mich. 407; *Ryan* v. *Towar*, 128 Mich. 463; *Uthermohlen* v. *Co.*, 50 W. Va. 457; *Harris* v. *Cowles* [Wash.], 80 Pac. 537; *Stendal* v. *Boyd*, 73 Minn. 53; *Richards* v. *Connell*, 45 Neb. 467; *Peters* v. *Bowman* [Cal.], 47 Pac. 113, 598.)

If the bar across the entrance to the conduit was pushed over by a person without authority, and by reason of such change Marcus was able to get into the conduit, and therein met his death, the defendant was not liable.   (3 Abbott, M. C., p. 2295, 2320; *Neal* v. *Bates*, 20 R. I. 793; *Ball* v. *Independence*, 41 Mo. App. 469.)

### RESPONDENT'S POINTS.

Plaintiff does not seek to recover for any defect in or negligence with respect to any part of the highway.   And the statute is only intended to apply to those injuries caused by defects in public ways or thoroughfares which affect their usefulness or condition for the purposes of travel.

Such a statute is not intended to apply to the common

33 Utah—15

law, liability of a municipal corporation for acts in a private capacity. (*D'Amico* v. *Boston,* 58 N. E. 158; *Pys* v. *Mankato* [Minn.], 38 N. W. 621; *Moran* v. *St. Paul,* 56 N. W. 80; *Hughes* v. *City of Fond du Lac* [Wis.], 41 N. W. 407.)

The latter part of the section referring to the presentation within a year of "any other claim" is not claimed in the brief to apply and clearly does not apply to actions in tort. (2 Smith's Modern Law Mun. Corp., sec. 917. *Harrigan* v. *Brooklyn,* 23 N. E. 741; *Davis* v. *Great Falls,* 77 Pac. 309; *Shields* v. *Town of Durham,* 24 S. E. 974; *Kelley* v. *City of Madson,* 43 Wis. 648.)

Any person who leaves any dangerous appliance, machinery, or anything having inherently secret dangers, or which in its ordinary use by children will occasion loss of life or injury, knowing that the thing is in its nature enticing and alluring to children of a tender age, and where they are impelled by their childish instincts to be upon or play with the dangerous thing; and who knowing that children so risk their lives, permits the thing to remain, without exercising reasonable care to guard against its use, is liable for the consequences which ensue.

This rule was laid down in the "turntable" cases. (*Railroad* v. *McDonald,* 152 U. S. 262; *Barrett* v. *S. P. Co.,* 91 Cal. 296, 303; *Railroad* v. *Fitzsimmons,* 22 Kan. 686, 31 Am. Rep. 203; *Powers* v. *Harlow,* 53 Mich. 507; *O'Malley* v. *Railroad,* 43 Minn. 289; *Railroad* v. *Stryon,* 1 S. W. 161; *Evansich* v. *Railroad.* 57 Tex. 126, 44 Am. 586; *Railroad* v. *Krayenbuhl,* 12 Am. Neg. 300; *Peters* v. *Bowman,* 115 Cal. 345, 47 Pac. 113, 598; *Keffe* v. *Railroad,* 21 Minn. 207, 18 Am. Rep. 393.)

The following cases are particularly applicable to the case at bar. (*Indianapolis* v. *Emmelman,* 9 N. E. 155; *Pekin* v. *McMahon,* 39 N. E. 484; *Hydraulic Works Co.* v. *Orr,* 83 Pa. St. 332; *Penso* v. *McCornick,* 25 N. E. 156; *Harriman* v. *R. R. Co.,* 12 N. E. 451; *Brinkley Car. Co.* v. *Cooper,* 31 S. W. 154; *Powers* v. *Harlow,* 19 N. W. 257; *Con. El. Co.* v. *Healy,* 70 Pac. 884; *Birge* v. *Gardner,* 19 Conn. 507; Price

v. *Atchinson, Water Co.,* 50 Pac. 540.   2 Shear. & R., Neg.
[4th Ed.], 705.)

Trespass is but one form of contributory negligence.   The
Supreme Court of the United States and most of the states
hold that where the dangerous situation is of a character to.
tempt children, to go into or upon it, and where the danger
is such that their immature judgment opposes no warning,
contributory negligence cannot be considered.   (*Railroad* v.
*McDonald,* 152 U. S. 262; *Railroad* v. *Stout,* 84 U. S. 657;
*Price* v. *Water Co.,* 50 Pac. 450; *Biggs* v. *Con. Barb Wire
Co.,* 5 Am. Neg. 355; *Lynch* v. *Murden,* 1 Q. B. 29; *Smith*
v. *O'Connor,* 48 Pa. St. 218; *Rauch* v. *Loyd,* 72 A. D. 747;
*Railroad Co.* v. *St. Johns,* 73 A. D. 149; *Railroad Co.* v.
*Duray,* 79 A. D. 374; *Railroad Co.* v. *Snyder,* 98 A. D. 175.;
*Chicago* v. *Major,* 68 A. D. 553.   See also Bishop Non. Cont.
Law, 854. 2 Cooley Torts, 1270-1.)

FRICK, J.

The plaintiff brought this action to recover damages for
the death of her son, a lad about eight years of age, alleged
to have been caused through the negligence of the defendant
in failing to guard the entrance into a certain waterway or
conduit constructed and maintained by it.   The pleadings re-
quire no special attention.   The allegations of the complaint
were sufficient to admit proof of all the facts hereinafter
stated, and the answer set forth all the matters in defense re-
ferred to in this opinion.   The evidence coming from both
sides fairly tends to establish the following facts:   The city,
in September, 1904, and for many years prior thereto, own-
ed and maintained a system of waterworks together with a
source of water supply which came from the mountains lying
to the north and east of the city.   It furnished water to the
inhabitants for domestic purposes through a system of pipe
lines, and for the water so used it collected pay in accordance
with established rates.   It also, through the same pipes, fur-
nished the inhabitants water for fire protection, for which
no special charges were made.   It also, by means of open
ditches and laterals,   distributed, without charge, certain

water among the inhabitants for irrigation purposes. One source of water supply came through what is known as "City Creek," which enters the city from the north and flows in a southwesterly direction through the northwesterly part of the city, and finally empties into the Jordan river west of the corporate limits. City Creek, like all mountain streams, has considerable fall, and the water flows rather swiftly and with considerable force. Some distance north of the city dams are placed across the stream, and by means of gates and weirs the water is forced into pipe lines for distribution. In the low-water season all the water is forced into these pipes, and none flows down the creek below the intake of the pipes; but in the spring and early summer months there is more water in the creek than the pipes will carry, and, when such is the case, the surplus flows down the stream through the city as stated above. In case of heavy rains, or when the tanks are flushed, or if for any reason water is not wanted in the pipes, it is likewise permitted to flow down the creek. This flow of water through the creek in its natural state has a tendency to erode or wash away the banks of the stream, and, to prevent this, the city, in 1891 or 1892, constructed a conduit or underground water-way of solid masonry 5½ feet in diameter on the inside, and cylindrical in form. The entrance to this conduit was immediately east of the east margin of State street. From there the conduit passed under ground to the corner of State and North Temple streets, thence west along and under that street to the west margin of Main, or West Temple, street, at which point it terminated. The water thence flowed in an open stream to the Jordan river. The entire length of the conduit was 915 feet. At a point 628 feet from the entrance the Jordan Canal, which was also underground, emptied its water into the conduit. The conduit, by reason of its sharp turns, was quite dark on the inside. There was one place about 225 feet from the entrance where, by means of a covered manhole, a little natural light came through into the conduit. Below this point the remainder of the distance was dark, except when the gates were up at the west end. These gates, however, were usually down; for the reason that the water

at that point, by means of them, was diverted into irrigating ditches to the north and south. It may be stated, therefore, that the conduit represented a practically dark cavern or tunnel for a distance of about four hundred feet below the manhole referred to, and to the point where the Jordan Canal entered it. Along the east margin of State street the city had constructed a tight board fence, and this fence was continued on the north bank of the stream, and also on the south bank, for some little distance up the stream, and beyond the entrance to the conduit. There were two passage ways leading from the street, one on the north of the entrance, the other to the south. Immediately across the street from the entrance, and a little north of west, a large school building was erected, at which a large number of children attended during the school year. This school was opened to the public early in September, 1904. About five years before the latter date the city placed strong bars of iron vertically across the entrance, which were fastened at the top by means of clamps to another bar of iron placed horizontally across the top of the entrance. The lower ends of the vertical bars were driven into the bed of the stream. The spaces between the bars were 5½ inches at the top and 6 inches at the bottom. One of these bars in some way became loose at the top and was shifted against another so that the space between the two bars was such that boys, or even adults could pass into the conduit. For a number of years the boys in the neighborhood, which was somewhat thickly settled, in playing around the entrance of the conduit in the bed of the stream during the dry or waterless season, would enter the conduit and play "jail" or "train" therein. Some time during the year 1903 different delegations of citizens living near the entrance of the conduit went before the city council and complained of the condition of the entrance, and called the council's attention to the danger to which the boys were exposed. An employee of the city, who for some years had charge of the entrance of the conduit, testified that he saw some boys in the conduit, drove them out, and replaced and fastened the bar. On numerous times thereafter he saw the boys about the

entrance, found the bar again misplaced, and replaced it, but did not fasten it, nor have it fastened. There is no evidence, however, that Marcus Brown, the deceased, or any of the boys who testified at the trial, was ever driven from the conduit or warned by an employee of the city, or any one in its behalf, to keep out of it. During the early part of September, 1904, after the fall term of the school had opened, Marcus Brown, the son of the plaintiff, without her knowledge or consent, entered and played in the conduit with quite a number of other boys. On the evening of the 21st day of that month he was last seen in the conduit about 6 or half past 6 o'clock. He could not be found that night, but the next morning his body was found at the west gate of the conduit. The water from the Jordan Canal entered the conduit in large volume, and with considerable force, and, while it could not be seen in the conduit, it, on account of the loud noise from rushing into the conduit, could be heard for some little distance before reaching it. The inference is that Marcus Brown either went into the water, or in some way fell into it and met death. Marcus was a bright boy, and above the average in intelligence and physical development for boys of his age. It developed at the trial that the boys had a lantern which they used in playing in the conduit, and by means of the light obtained from it they would go down to where the water rushed in from the Jordan Canal; that they had been doing this for a period of about three years; and that the bar was in its displaced condition for about a year before the accident occurred. The plaintiff had moved into the neighborhood about four months before the accident, and did not know anything about the conduit. During the spring or high water season the conduit required the constant attention of one man to remove the floating debris in the stream, which, if not removed, would cause the entrance to be clogged, and the water to back up in the stream. During the dry season it required no special guarding nor attention. We have stated the foregoing facts in detail, so that all questions raised by counsel, and discussed in the opinion, may be better understood. Upon substantially the foregoing facts the court submitted the

case to a jury. A verdict was returned in favor of plaintiff.
From the judgment entered upon the verdict, this appeal is.
taken.

The defendant requested the court to direct a verdict in its
favor, which the court refused to do. While numerous errors
are assigned, all that are important may be considered upon
the alleged error based upon the refusal of the court to di-
rect a verdict. The reasons argued by counsel why a verdict
should have been directed in this case may be stated as fol-
lows: (1) That the plaintiff at no time, nor in any manner
presented a claim to the city council as required by the stat-
utes of this state; (2) that the city conducted its system of
waterworks, of which the conduit was a part, in a govern-
mental capacity; (3) that if it be held that the city conducted
its system of waterworks in its corporate capacity merely,
then, under the undisputed facts, the city is not shown to
have been guilty of any negligence to warrant a recovery as
matter of law; (4) that if such negligence existed on the
part of the city, then both the boy and his mother were guilty
of contributory negligence as matter of law; and, further,
that the boy was a trespasser, and as to such a person the city
was not liable for mere passive negligence.

Referring to the first reason stated, the record discloses that
the plaintiff neither alleged nor proved the presentation of
a claim to the city council. Counsel for the city assert that
she was required to allege and prove such presentation as a
condition precedent to her right of recovery. The statute in
force at the time of the accident, so far as material, provides
as follows:

"All claims against a city or town for damages or injury alleged
to have arisen from the defective, unsafe, dangerous, or obstructed con-
dition of any street, alley, cross-walk, sidewalk, culvert or bridge of
any city or town, or through the negligence of the city or town au-
thorities in respect to any such street, alley, cross-walk, sidewalk,
culvert or bridge *shall within ninety days after the happening of such
injury or damage* be presented to the city council, . . . in writing,
signed by the claimant or by some authorized person, properly veri-
fied, describing the time, place, cause and extent of the damage or in-
jury; and no action shall be maintained against any city . . . for

injury to person or property, unless it appears that the claim for which
the action was brought was presented to the council as aforesaid, and
that the council . . . did not, within ninety days thereafter, audit
and allow the same. Every other claim against the city . . . must
be presented to the city council . . . within one year after the
last item of the account or claim accrued." (Italics ours.)

The section following provides, in substance, that it should
be a sufficient bar to any action against a city that any claim
mentioned in the preceding section had not been presented
to the city council in the manner and within the time speci-
fied. Under these provisions it is asserted that the claim up-
on which this action is based should have been presented to
the city council, and as no allegaton nor proof of such pres-
entation was made there is no right of action. Is this con-
tention sound? It has been frequently held, that, under stat-
utes similar to the foregoing, the presentation of claims fall-
ing within the provisions of such statutes is a condition pre-
cedent, and unless presented no recovery can be had. We
have no disposition to modify the rule so announced, or de-
part from it. Does the claim in question here come within
the provisions of the section above quoted? We think not.
It will be observed the claims that require presentation are
of two kinds: (1) Claims arising out of defective or ob-
structed streets, alleys, cross-walks, sidewalks, culverts or
bridges, or for negligence of the city authorities with respect
thereto; (2) claims consisting of various items of account or
otherwise that may arise out of transactions with the city, and
not arising in tort. This seems manifest from the language
used with respect to the character of the claims that must be
presented to the city council under the second class men-
tioned in the statute. It seems reasonably clear to us that, in
view of the case of *Dawes v. City of Great Falls,* 31 Mont.
9, 77 Pac. 309, the claim in this case does not belong to the
class last above noticed. Does it come within the first class?
It is not a claim which arose out of any matters specially
enumerated in the first class. Those are limited to defects in,
or the obstructed condition of, streets, alleys, cross-walks, side-
walks, culverts or bridges. All these pertain to places and
things which the city is bound by law to maintain in a reason-

.ably safe condition, and the statute makes it liable for a neglect of duty with respect thereto. The claim in question does not come within this class. It is one which arose out of the defective condition of the city's property, which is owned and maintained in its corporate capacity merely, and over which it had dominion the same as any property owner. Moreover, the language of the statute does not cover such a claim. A claim included within the statute is one pertaining to a personal injury or damage to property, and must be presented "within ninety days after the happening of such injury or damage." In an action to recover damages for negligently causing the death of one a presentation of a claim is not required, for the right of action does not arise until the injury results in death. While the injury may be said to be the cause of death, the injury without death would not give a right of action such as we are now considering. If we should assume a case where the injury did not result in death until the ninety-first day after the injury, or thereafter, no claim could be presented at all, for the reason that the time runs from the date of injury, and not from the time the full consequences resulting therefrom are known. The words "or damage" relate to the damages that arise immediately out of the injury to the party or to his property, and not to such as may be sustained by a third person as a secondary result, although caused by the original injury. The statute must receive a reasonable construction, and such as will make it possible to present a claim. If, therefore, a claim may not arise until the time has elapsed in which it must be presented, the statute should not be held to apply, unless the language used therein permits of no other construction. We are firmly of the opinion that it was not the intention of the Legislature to include within the statute secondary claims or damages arising out of death, which are suffered by third parties by reason of such death. This view, we think, is amply sustained by the authorities. (*McKeigue v. Janesville,* 68 Wis. 50, 31 N. W. 291; *Pye v. Mankato,* 38 Minn. 536, 38 N. W. 621; *Moran v. City of St. Paul,* 54 Minn. 279, 56 N. W. 80; *Dawes v. City of Great-Falls,* 31 Mont. 9, 77 Pac. 309; *May-*

*lone v. Otiy of St. Paul* 40 Minn. 406, 42 N. W. 88.) The cases cited by counsel for the city to the contrary are all based upon statutes, the terms of which are much broader than our own. In many states all claims must be presented before action can be maintained; in other states, like Utah, claims need be presented only in specified instances. An examination of the authorities will disclose that, where specific matters are mentioned in a statute for which a claim must be presented as a condition precedent to a right of action, claims arising out of matters not so mentioned are excluded and require no presentation before an action may be maintained. The claim in the case at bar falls clearly within the latter class, and therefore the court did not err in refusing to direct the jury as requested upon this ground.

Recurring now to the second reason advanced by counsel for the city, namely, that the city owned and conducted its waterworks in a governmental capacity, and for that reason is not liable, we think, under the authorities, it is likewise untenable. It may be conceded, for the purposes of this discussion, that, in so far as the city provides apparatus and water for fire protection, it acts in a governmental capacity. The city, however, was not required to assume the duty of furnishing its inhabitants water for all uses and purposes. When it acquired property, and constructed the system of waterworks for that purpose, however, it did so voluntarily, and with a view of deriving revenue therefrom. It, therefore, acquired, owned, and conducted its water system and the property connected therewith, except as stated above, as any other private corporation or owner would, and is liable in like manner and to the same extent as such owners would be. Mr. Thompson, in his Commentaries on the Law of Negligence, vol. 5, sec. 5788, clearly shows that it is optional with a municipal corporation whether it will assume certain duties or exercise certain powers or not, and that it cannot be called to account in any way for not assuming or exercising them. After stating the law in this regard, the author proceeds to state the rule in case the duties are in fact assumed, and the power is exercised, as follows:

"But if it [the city] undertakes to open, improve, or grade the highway, street, or sidewalk, dig the sewer or drain, build the bridge, construct the culvert, open the park, plant the shade trees, light the street or bridge, erect the public building, or waterworks, or wharf, or pier, or dock, and its officers and agents do the work negligently or unskillfully, or negligently suffer it to get out of repair, and in consequence of such negligence or unskillfulness and not in consequence of the mere fact that the work was done, damage accrues to a private person, he may maintain an action against the city therefor."

The rule with regard to the liability of municipal corporations is stated in conformity with the foregoing quotation in 20 Am. & Eng. Ency. Law (2d Ed.), 1205. The distinction with respect to the liability of the municipal corporation to provide water and apparatus for fire protection and in the ownership and control of waterworks for general purposes is clearly pointed out by the Supreme Court of Minnesota in the case of *Miller v. Minneapolis,* 75 Minn. 132, 77 N. W. 788. The following well-considered cases clearly demonstrate that the waterworks system of the city and the property connected therewith are not owned, maintained, nor operated in a governmental capacity, and the text as quoted from Thompson, *supra,* is illustrated and applied therein: *Lynch v. Springfield,* 174 Mass. 430, 54 N. E. 871; *Galveston v. Posnainsky,* 62 Tex. 127, 50 Am. Rep. 517; *Wilkins v. Rutland,* 61 Vt. 336, 17 Atl. 735; *Lloyd v. Mayor,* 5 N. Y. 374, 55 Am. Dec. 347; *City of Pekin v. McMahon,* 154 Ill. 141, 39 N. E. 484, 27 L. R. A. 206, 45 Am. St. Rep. 114; *Briegel v. Philadelphia,* 135 Pa. 451, 19 Atl. 1038, 20 Am. St. Rep. 885; *Wagner v. Rock Island,* 146 Ill. 139, 34 N. E. 545, 21 L. R. A. 519; *Ogden City v. Waterworks & Irrigation Co.,* 28 Utah 25, 76 Pac. 1069. Nor does it make any difference that the conduit in which the accident occurred was not a part of the waterworks system which was used in the distribution of water to the inhabitants for pay. It was still a part of the system, and a necessary part thereof. That the water flowing through the conduit was used for irrigation without charge to the user makes no difference. When the city assumed the right of conducting the water and of distributing it, it was required to ex-

ercise the same degree of care with respect to the maintenance and use of property devoted to that purpose as any private owner would have been. (*City v. Babbitt*, 8 Tex. Civ. App. 432, 28 S. W. 702; 2 Dillon on Mun. Corps. (4th Ed.), sec. 980. We are of the opinion that the court committed no error in refusing to direct a verdict for the city upon this ground.

The third ground upon which the city based its request for a directed verdict in its favor is one that is not entirely free from difficulty with respect to the law, nor is it free from doubt with regard to the sufficiency of the facts to sustain the verdict. The trial court submitted the case to the jury upon the doctrine announced in what are termed the "turntable" cases. *Railroad Co. v. Stout*, 17 Wall. (U. S.) 657, 21 L. Ed. 745, *Keffe v. Milwaukee, St. P. Ry.*, 21 Minn. 207, 18 Am. Rep. 393, and *Barrett v. So. Pac. Co.*, 91 Cal. 296, 27 Pac. 666, 25 Am. St. Rep. 186, may be classed as some of the leading cases upon that subject, and as presenting a fair illustration of the principles upon which the doctrine of the turntable cases rests. Since the first of the foregoing cases was decided, a large number of states have followed the doctrine therein announced, and it has become so generally known and recognized by both bench and bar that it is not deemed necessary to cite or refer to the numerous cases wherein the doctrine is illustrated and discussed. In some states, however, namely, Massachusetts, New Hampshire, New York, and, perhaps, a few others, the doctrine has not been adopted by the courts. In some states where the doctrine prevails the courts have sought to limit its application to open and dangerous machinery and appliances. Of this class *Sullivan v. Huidekoper*, 27 App. D. C. 154, 5 L. R. A. (N. S.), 263, *Overholt v. Veiths*, 93 Mo. 422, 6 S. W. 74, 3 Am. St. Rep. 557, *Richards v. Connell*, 45 Neb. 467, 63 N. W. 915, and *Stendal v. Boyd*, 73 Minn. 53, 75 N. W. 735, 42 L. R. A. 288, 72 Am. St. Rep. 597, are fair examples. The more recent adjudications, however, seem to apply the doctrine of the turnable cases to artificial structures and things other than manchinery, when such structures and things are in themselves dangerous

and are alluring or attractive to children of immature judgment and discretion. This class is well illustrated by the following, among other, cases: *City of Pekin v. McMahon,* 154 Ill. 141, 39 N. E. 484, 27 L. R. A. 206, 45 Am. St. Rep. 114; *Brinkley Car Works & Mfg. Co. v. Cooper,* 60 Ark. 545, 31 S. W. 154, 46 Am. St. Rep. 216. A large number of cases of each class might be cited in which the various grounds upon which the courts rest their decisions are stated, but the foregoing cases are deemed sufficient as illustrative of each class. In this connection, however, we desire to present a quotation from the opinion of Chief Justice Beatty, found in the case of *Peters v. Bowman,* 115 Cal. at page 356, 47 Pac. at page 599, 56 Am. St. Rep. 106, which briefly and clearly states the grounds upon which the cases last above referred to are based. He says:

"The owner of a thing dangerous and attractive to children is not always and universally liable for an injury to a child tempted by the attraction. His liability bears a relation to the character of the thing, whether natural and common, or artificial and uncommon, to the comparative ease or difficulty of preventing the danger without destroying or impairing the usefulness of the thing, and, in short, to the reasonableness and propriety of his own conduct, in view of all surrounding circumstances and conditions. As to common dangers existing in the order of nature, it is the duty of parents to guard and warn their children, and, failing to do so, they should not expect to hold others responsible for their own want of care. But, with respect to dangers specially created by the act of the owner, novel in character, attractive and dangerous to children, easily guarded and rendered safe, the rule is, as it ought to be, different."

If the doctrine of the turnable cases is to be adopted in this jurisdiction—and we think it should be—it seems to us that it should be applied in accordance with the principles laid down by Chief Justice Beatty. We are not unmindful of, nor do we under-estimate, the difficulty that may arise in the application of the doctrine to all kinds of cases and under all circumstances. Neither are we willing to relax the general rule of law which permits owners of property to use it in accordance with their own judgment and to place upon the surface, or otherwise, structures, machinery, and appliances in such manner and to such extent as to them may seem proper

and necessary, or convenient in the conduct of their own af-
fairs.   So long as such use, whatever it may be, does not in-
terfere with nor injure another's property, or in some way in-
terfere with his personal or property rights, the law does not,
and cannot, interfere.   As against mere intruders or licensees,
the owner need not maintain his premises in a reasonably safe
condition; but as to those who come upon them by invitation,
express or implied, he owes the duty of reasonable care for
their safety.   That is the general rule, and to depart from it
in favor of adult persons would cast a burden upon the own-
ership and dominion of private property which would be in-
tolerable.   But is this right of dominion and use really in-
vaded when an exception is made in favor of children of im-
mature judgment and discretion?   We have already pointed
out that, as to adults or children who may come upon another's
premises either by express or implied invitation, the law im-
poses the duty upon the owner to exercise reasonable care for
their safety.   If, therefore, the owner places something upon
his premises which is easily accessible to children, and which
is alluring and attractive to their childish propensities, and
excites their curiosity and desire for  play,  it,  in  effect,
amounts to an implied invitation to them to come upon the
premises.   If in connection with the attractiveness the thing
is inherently dangerous to a child of immature judgment, it
may well be that the owner of premises may, under particular
circumstances, be held liable for his neglect of duty to the
child going thereon by reason of such allurement.   It is true
that a child has no greater legal right to intrude upon an-
other's premises than has an adult; but duties may, and, un-
der particular conditions, do, arise, even in favor of adults
who are exposed to danger at places where they have no
legal right to be.   While a child may know that it ought not
to go on another's land, it cannot resist the childish instincts
that lead it to inspect and play with what is attractive.   It
is wholly unmindful of the danger, and has little, if any, real
appreciation of the consequences that may come from its acts.
These propensities and instincts are known to all, and hence
must be guarded against by all.   It is no answer to say to a

child: "This property is mine. I can do with it as I please so long as I do not interfere with another's personal or property rights. You are a mere intruder. I have not infringed upon your rights. Therefore you have no claim upon me." The question in such a case is has the owner made his property so attractive as to allure children? Did he leave the attractive thing so that it was easily accessible to them? And did it expose them to uncommon and peculiar dangers? These as a general rule are questions of fact for a jury to pass on. We are aware that there are some courts that severely criticise the doctrine when applied in this class of cases.

It is urged that the rights of property cannot be burdened or curtailed in this way. Moreover, it is said by some courts that to follow the doctrine to its logical conclusion leads to absurdity; that if it is applied to one instrumentality, it should be applied to all; and that this would lead to holding owners of property liable, if a child were attracted by a wheelbarrow, a plow, a fruit tree, and many other common implements and objects. But this does not follow. All of these things are common. Neither are they specially attractive nor dangerous. That some may attract and be of some danger it is true. But it is not an uncommon danger, and not such as must be guarded against. As to all such and like things no court would permit a recovery as matter of law. This is well illustrated in the case of *Harris v. Cowles,* 38 Wash. 331, 80 Pac. 537, 107 Am. St. Rep. 847, where the Supreme Court of Washington refused to permit a child to recover for an injury received by it while playing with a revolving door. But it is otherwise with respect to unusual dangers and specially attractive things such as are artificial and uncommon—such as are pointed out by Chief Justice Beatty in the case quoted from. Indeed that case is a practical illustration of the extent of the rule. A recovery was denied in that case upon the ground that, while the pond or pool of water in question was artificially produced, and while it was alluring and attractive, it was no more so than a natural pond would have been, and because it was not practical to guard against bodies or streams of water. It is, however, pointed out that, if the thing is artificial, uncom-

mon, attractive, and dangerous, and may, with reasonable ef-
fort and expense, be guarded and made reasonably safe, then
the duty to make it so may not be disregarded, and the jury,
under all the facts and circumstances of a particular case may
so find.  It seems to us that these principles underlie the doc-
trine of the turntable cases, and if that doctrine is sound—and
we think it is—it should not be limited to turntables and ma-
chinery of like character.  To so limit it, in effect, applies one
standard of care to one kind of dangerous things, and a dif-
ferent standard to another equally attractive and equally dan-
gerous, which is placed upon premises and there maintained
under similar circumstances and conditions.  We are unwill-
ing to either promulgate or adopt such a rule.  We are con-
strained to hold, therefore, that the doctrine of the turntable
cases should be applied to all things that are uncommon and
are artificially produced, and which are attractive and allur-
ing to children of immature judgment and discretion, and are
inherently dangerous, and where it is practical to guard them
without serious inconvenience and without great expense to
the owner.  Applying this doctrine to the facts of this case,
is the city liable?

The trial court (whose instructions are generally well con-
sidered), in an exceptionally full and explicit charge, directed
the jury's attention to the particular matters that they were
required to find in order to return a verdict for the plaintiff.
Among other things the court specially emphasized that before
they could find for the plaintiff they must find from the evi-
dence that the inside of the conduit was attractive and dan-
gerous; that the danger relied on by the plaintiff arose out of
the flow of water into the conduit from the Jordan Canal
some 628 feet distant from the entrance of the conduit; and
that the officers and agents of the city, in the exercise of reason-
abl care and prudence, should have foreseen that the inflow of
such water was dangerous, and that some such injury might
be occasioned to the boys, or some of them, entering into the
conduit and playing therein.  The jury, with all the facts and
circumstances before them, found all these in favor of the
plaintiff.  We have no hesitancy in saying that, if the facts

were for us to pass upon, we should be forced to arrive at a conclusion different from that reached by the jury; for it would be quite difficult for us to see how the officers of the city as reasonably prudent men, should have foreseen that boys would go down a dark passage way of over six hundred feet in length, nearly four hundred feet of which was totally dark, and play therein, and that although they did so, they would go or fall into the water coming into the conduit from the Jordan Canal. And if childish instincts induced them to resort to the conduit to play "jail" or otherwise, one would naturally assume that they would instinctively avoid going into the dark passage way to the length of nearly two ordinary city blocks. In the statement herein made that, were we permitted to pass on the facts and determine the question, not as matter of law but of fact, we would arrive at a conclusion different from that found by the jury, the Chief Justice authorizes us to say that he is not prepared to say that, if he were a trier of the fact, he would find in favor of the defendant on the question of negligence (upon this question he expresses no opinion); but that he is, however, clearly of the opinion that the facts amply justified the court in submitting the question of negligence to the jury. In this connection it must, however, be said that the entering into and playing in the conduit by the boys continued for quite a number of years, that the employees of the city knew the boys were doing so; that the city council, about a year before the accident, was advised, by delegations of citizens living in the neighborhood, of the actual conditions; and that the defendant knew, or ought to have known, that the boys, in view of their familiarity with the conduit, might lose their native fear and might finally go and continue to go to the point of danger, as the testimony disclosed they did. Notwithstanding all this, in view of all the facts and circumstances, as triers of the facts, the majority of this court would still be impelled to hold that the accident could not reasonably have been anticipated by ordinarily careful and prudent men. But is the question so clear and free from doubt that reasonable men cannot differ upon it? May

33 Utah—16

not reasonable men, in considering all the facts and circumstances, arrive at different conclusions? The mere fact that the men who passed upon the facts have found against the city upon this point is not conclusive. But such a finding always requires a close scrutiny of the record to ascertain whether or not there may not be some inferences arising out of the particular facts upon which reasonable men may draw different conclusions. While the mere finding is not conclusive that there is evidence in support thereof, nor conclusive that all reasonable men should agree with it or dissent therefrom, it presents a question that merits a most careful consideration; and after giving it such consideration, and after much reflection, we have been forced to the conclusion that we cannot say as a matter of law that there is no evidence which reasonably tends to support the verdict. We cannot say that all reasonable men ought to have declared a result different from that reached by the jury. To authorize this requires a clear case, and not one where there is a serious doubt. The jury in some cases may misjudge the facts. Courts might do likewise. Members of the court may arrive at different conclusions even upon undisputed facts. While we are satisfied that the facts present what may be termed a "border-line case," and upon them a majority of this court should find for the city, yet we are equally well satisfied that the facts and circumstances, together with all the inferences that may be deduced therefrom, did not leave it so clear that we have a right to say, as matter of law, that the findings of the jury are wholly unsupported. In this regard we are also required to give some weight to the judgment of the trial court in sustaining the verdict by overruling the motion for a new trial. If we should interfere with the verdicts in all doubtful cases simply because upon the evidence we would have arrived at an opposite conclusion, then the proposition would be reduced to this: In any doubtful case, if we agreed with the findings of the jury, we would approve the verdict, but if we did not, we would set it aside. If we have no authority to do this in cases where there is a strong conflict in the evidence, which would support a verdict either way, what greater right have

we to do so in a case where there is doubt as to whether the jury should have found a particular act or omission to act, or particular conduct, to have constituted negligence, or otherwise? We, therefore, cannot disturb the verdict upon this ground.

The last question presented, namely, that of contributory negligence upon the part of the mother and the deceased, was peculiarly a question of fact for the jury. The instructions upon this question were full and clear, and in accordance with the law upon the subject.

The question that the boy was a trespasser, and therefore no recovery can be had, was involved in the third proposition discussed and needs no further consideration.

There are other questions presented, but no error as to any of them is perceived; nor are they of such character or importance as to require discussion.

In view of what we have said, it follows that the judgment should be, and it accordingly is affirmed with costs to plaintiff.

McCARTY, C. J., and STRAUP, J., concur.