Jonathan Robert WEBER, By and Through his guardians and conservators, Donald R. WEBER and Winona Weber, and Donald R. Weber and Winona Weber, individually, Plaintiffs and Appellants,

v.

SPRINGVILLE CITY, Springville Irrigation Company, Thomas W. Biesinger, Virginia B. Law, and John Does I through V, Defendants and Respondents.

No. 19467.

Supreme Court of Utah.

Sept. 17, 1986.

---

Jackson Howard, Provo, for plaintiffs and appellants.

Tim Dalton Dunn, Salt Lake City, for Springville City.

Darwin C. Hansen, Bountiful, for Biesinger.

Harold D. Mitchell, Springville, for Springville Irrigation.

L. Rich Humpherys, Salt Lake City, for Virginia Law.

HALL, Chief Justice:

Donald and Winona Weber ("plaintiffs"), individually and on behalf of their minor child Jonathan, sued Thomas W. Biesinger for negligence and breach of contract and Springville City and Springville Irrigation Company ("Irrigation Co.") for negligence. Plaintiffs also sued Virginia Law for negligence, but did not appeal the lower court's decision in that defendant's favor. Prior to argument, plaintiffs and Biesinger settled out of court, and subsequently, this Court entered an order dismissing plaintiffs' appeal against Biesinger with prejudice. Plaintiffs seek reversal of the district court's orders granting Springville City's and Irrigation Co.'s motions for summary judgment and dismissing the case.

I

The record, when read in the light most favorable to plaintiffs, reveals the following events underlying this action.[1] Sometime prior to 1975, Biesinger bought an unimproved tract of land in Springville City, Utah. He then built an apartment complex on the property located at 649 East Swenson Avenue. To the north of the complex, there are two waterways that run somewhat parallel to one another: an inland stream known as "Hobble Creek" and a covered irrigation ditch owned by Irrigation Co.

---

1. In *Blodgett v. Martsch,* 590 P.2d 298 (Utah 1978), we stated: "In reviewing the record on any appeal from summary judgment, we treat the statements and evidentiary materials of the appellant as if a jury would receive them as the only credible evidence, and we sustain the judgment only if no issues of fact which could affect the outcome can be discerned." *Id.* at 300. *See also* Utah R.Civ.P. 56(c) (Repl.Vol. 9B, 1977 ed.).

Water flows from southeast to northwest in both waterways. Biesinger's apartment complex[1] and the attendant common areas are separated from Hobble Creek by a thin strip of land that was owned by Glen A. Law when this action arose.

Irrigation Co. has the right to divert certain quantities of water out of Hobble Creek for irrigation purposes. The diversion occurs at various points—the lowest of which is at Swenson Dam, located immediately upstream from the Seventh East bridge or about one hundred forty feet east of Biesinger's apartment complex. The bridge is composed of three culvert pipes covered with bridge decking. The dam is made up of some materials, perhaps wooden planks, that are placed in front of the culverts. Irrigation Co. annually places Swenson Dam into Hobble Creek to impede creek water from continuing in its natural path. Water backs up behind the dam and is forced into Irrigation Co.'s ditch. Excess water flows over the dam and through the pipes and continues its natural path down Hobble Creek. The record indicates that Irrigation Co.'s watermaster, Hardy Child, was aware that children played around the dam in the summer and that he was fearful about it.

Springville City performs some maintenance on Hobble Creek, which crosses Springville's corporate boundaries. Specifically, Springville City has responsibility for shoring up the creek's banks during the peak runoff periods in higher water years and pulling logs and debris out of the creek during the spring runoff. The City maintains the banks of Hobble Creek in order to preserve bridges where the channel abuts city property. The City also maintains the Seventh East bridge. There is evidence in the record that Springville City has contracted for some dredging of Hobble Creek. However, the dredging operations did not take place near the scene of the incident. Moreover, the record indicates that the course of the stream has never been diverted or altered by Springville City.

When Biesinger constructed the apartment complex, Irrigation Co.'s ditch was not covered. Thus, during construction Biesinger erected a four-foot fence at the northern boundary of his property to prevent children from falling into the ditch on Glen Law's property.[2] The west end of Biesinger's fence is connected to a neighbor's fence. The southeast end of Biesinger's fence abuts a footbridge which paral-

---

**2.** The ditch was covered prior to plaintiffs' inju-   ries, perhaps in 1977 or 1978.

lels the Seventh East bridge such that people can pass around the fence.

On or before June 13, 1980, plaintiffs answered Biesinger's advertisement regarding an apartment for rent. They were shown the apartment by Biesinger's agents, who purported to be the managers of the complex. Upon hearing the sound of a nearby stream, plaintiffs inquired whether the common area was safe for children and whether children could gain access to the stream. The agents told plaintiffs that the area was safe, that a proper fence and a sufficient gate had been placed in the rear of the property, and that children could not get to the stream. In actuality, the fence was in disrepair and inadequate to prevent small children from accessing Hobble Creek. Plaintiffs then entered into a rental agreement with Biesinger for apartment No. 36.

On June 18, 1980, while plaintiffs were parked near the southeast corner of the complex and moving their belongings into Unit 36, Jonathan, aged two and one-half, strayed from the apartment complex and fell into Hobble Creek. He was rescued a short time later, but not before sustaining permanent debilitating mental and physical injuries. Although Jonathan was allegedly last seen walking west in front of the apartments, there is no evidence indicating the point where he fell into Hobble Creek; in fact, people near the scene about the time the incident occurred claimed that they had no idea where Jonathan fell in.

## II

At argument, plaintiffs' attorney explained that the lower court granted summary judgment in defendants' favor and instructed each defendant to prepare orders incorporating the judge's ruling.

Plaintiffs' counsel complained that since defendants orders were only prepared as orders of dismissal, some significance should attach to the fact that the orders lacked findings of fact and conclusions of law. Utah Rule of Civil Procedure 52(a) (Repl. Vol. 9B, 1977 ed.) expressly disposes of counsel's concerns: "Findings of fact and conclusions of law are unnecessary on decisions of motions under Rule 12 or 56 or any other motion except as provided in Rule 41(b)." We dealt with this argument in *Ellertson v. Dansie:*

> Plaintiff also contends that the trial court erred in failing to make findings of fact. *It is of course permissible, and in some instances may be helpful,* if the court so desires, to recite what it regards as the undisputed facts upon which it bases its summary judgment. But it is under no obligation to do so.[3]

## III

Plaintiffs' actions against Irrigation Co. and Springville City are grounded primarily upon negligence theory. We have previously defined the elements of a negligence action to include: "(1) a duty of reasonable care owed by the defendant to [the] plaintiff; (2) a breach of that duty; (3) the causation, both actually and proximately, of [the] injury; and (4) the suffering of damages by the plaintiff."[4] Resolution of this appeal requires us to consider only the first and third of these elements.[5]

The question of whether a "duty" exists is a question of law, and this Court, which is not bound by the trial court's conclusions, may independently review the issue.[6] Accordingly, the lack of legal conclusions in the record does not in any respect hinder our decision.

---

**3.** 576 P.2d 867, 868 (Utah 1978) (emphasis added; footnote omitted).

**4.** *Williams v. Melby,* 699 P.2d 723, 726 (Utah 1985).

**5.** The doctrine of governmental immunity generally provides that despite the existence of an apparent duty, the municipal corporation, in the exercise of a governmental function, is immune from tort liability. W. Prosser, *Handbook of the Law of Torts* § 131 (4th ed. 1971). Therefore, if the underlying tort does not exist, governmental immunity analysis is not relevant.

**6.** *See Automotive Mfrs. Warehouse, Inc. v. Service Auto Parts, Inc.,* 596 P.2d 1033, 1036 (Utah 1979).

■ Plaintiffs rely on several theories to establish a duty of care on the part of Springville City. Plaintiffs first contend that Springville City had a duty to fence or cover Hobble Creek or to insure that the creek was fenced or covered in the vicinity of this incident because it assumed responsibility for insuring that buildings constructed within its boundaries were safe.[7] Specifically, plaintiffs contend that Springville City, Utah, Ordinance § 10-1-4 charges the City with a duty to protect its residents from water hazards in close proximity to buildings and developments for which it has issued building permits. The ordinance provides: "No building permit shall be issued for any property which is crossed by or fronted by an irrigation ditch, unless the plans and specifications for the construction to be accomplished thereon provide for the covering of such irrigation ditch." Even if we assume for purposes of argument that Biesinger's apartment building is "crossed by or fronted by" Hobble Creek, plaintiffs' reasoning remains fundamentally flawed.

Utah, like most jurisdictions, has recognized that one who undertakes to render services has a duty to exercise reasonable care.[8] Yet the nature of this rule requires the Court to narrowly construe the scope of any assumed duty. Adoption of plaintiffs' theory would require this Court to hold that Hobble Creek is an irrigation ditch or to judicially extend the purpose of the City ordinance beyond its plain meaning. An "irrigation ditch" is an artificial watercourse designed to divert a flow of water to areas where it otherwise would not flow because of the configurations of the surrounding land.[9] Irrigation Co.'s ditch comes within this definition and thus within the ordinance. At some point, Springville City's requirement that the ditch be covered was complied with.

The incident underlying this case, however, occurred in Hobble Creek, which, as distinguished from Irrigation Co.'s ditch, is a living stream. The creek, as discussed below, is a naturally channelized current of water; the current is caused by the natural configuration of the surrounding land from which the water is collected.[10] Further, Hobble Creek has a definite and at least periodic source of water.[11] Therefore, Hobble Creek is a natural watercourse, a classification mutually exclusive of artificial waterways. It follows that Hobble Creek does not fall within the terms of the ordinance. In short, section 10-1-4 imposes no duty on Springville City to insure that Hobble Creek is fenced or covered.

Plaintiffs claim that because Springville City cleared debris from Hobble Creek, shored up the creek's banks, and conducted dredging operations from time to time, a duty arose on the part of the City to protect Springville residents from water hazards associated with Hobble Creek along its entire shore line within the city limits. Alternatively, plaintiffs rely on the fact that Springville City and Irrigation Co. either constructed or maintained the Seventh East bridge or Swenson Dam. Plaintiffs therefore claim that Swenson Dam posed an unreasonable risk to children and thus Springville City and Irrigation Co. had a duty to fence that area. We now discuss these arguments in turn.

■ First, plaintiffs claim that Springville City, by its above-described activities,

---

**7.** Plaintiffs rely principally upon Restatement (Second) of Torts § 323 (1965), which states:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's relliance upon the undertaking.

**8.** *DCR Inc. v. Peak Alarm Co.,* 663 P.2d 433, 436 (Utah 1983) (also quoting Restatement (Second) of Torts § 323 (1965) ).

**9.** 93 C.J.S. *Waters* § 129 (1956).

**10.** 93 C.J.S. *Waters* § 3 (1956).

**11.** *Id.*

*assumed* responsibility for the upkeep of Hobble Creek for the purpose of protecting its citizenry from the creek's water hazards. However, there is no evidence from which a jury could find that Springville City, by maintaining the creek's streambed or shoreline to protect against flooding and the consequences of excessive spring runoff, assumed a duty to prevent children or adults from drowning in the stream. Therefore, the argument that Springville City assumed a duty to cover or fence the entire length of Hobble Creek within the city is without merit.

Second, plaintiffs claim that Springville City's maintenance of and improvements on Hobble Creek's streambed and banks changed the nature of the waterway such that this case should have gone to the jury based on the attractive nuisance doctrine; the contention is that the entire length of the waterway within the city limits constituted an attractive nuisance. In general, a landowner owes no duty to a trespasser, except to refrain from causing willful and wanton injury to him or her.[12] However, public policy dictates that an exception to this rule must prevail when the trespasser is a child. Although it has several names, this exception is most commonly referred to as "the attractive nuisance doctrine" or "the turntable doctrine." The elements required for the doctrine to apply in Utah are stated in the leading case of *Brown v. Salt Lake City:*[13]

> [T]he doctrine of the turntable cases should be applied to all things that [1] are uncommon and [2] are artificially produced, and [3] which are attractive and alluring to children of immature judgment and discretion, and [4] are inherently dangerous, and [5] where it is practical to guard against them without serious inconvenience and without great expense to the owner.[14]

If a trespassing child's injuries are caused by a property owner's failure to exercise reasonable care to safeguard children from a condition subject to the doctrine, then the child may recover.

The Restatement (Second) of Torts § 339 (1965) states the rule somewhat differently:

> A possessor of land is subject to liability for physical harm to children trespassing thereon caused by an artificial condition upon the land if
>
> (a) the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass, and
>
> (b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, and
>
> (c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it, and
>
> (d) the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, and
>
> (e) the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children.

It is apparent that Utah's rule and The Restatement's rule are both expressly limited to artificial conditions. As previously stated, Hobble Creek is a natural watercourse. Furthermore, Springville City's maintenance of and improvements on Hobble Creek were not sufficient to change the character of the inland stream:

> A natural watercourse does not lose its character as such by the fact that a part of its channel has been artificially cre-

---

12. *See Featherstone v. Berg*, 28 Utah 2d 94, 95, 498 P.2d 660, 661 (1972).

13. 33 Utah 222, 93 P. 570 (1908).

14. *Id.* at 240, 93 P. at 576.

ated, and it is not necessary that a watercourse should originate exclusively as a work of nature; it may be created as the result of the settlement of adjacent territory, and in its creation it may be aided by the hand of man. . . .

A natural watercourse does not cease to be such because of artificial changes, and particularly if the changes have been continued for a prescriptive time. Thus, the character of a watercourse is not changed because of the artificial deepening or straightening of the channel, or by reason of the stream['s] being confined in a pipe, or because it is used as a conduit to carry other waters, or because a pond is created by a dam, and a watercourse does not lose its character as such because it is artificially obstructed, and all the water diverted therefrom, as where the water has all been dammed at a place far up the stream, no matter for how long a period.[15]

It is well settled in this state and the great majority of other jurisdictions that a natural watercourse does not come within the scope of the attractive nuisance doctrine.[16] As stated in *Brown*: "As to common dangers existing in the order of nature, it is the duty of parents to guard and warn their children and, failing to do so, they should not expect to hold others responsible for their own want of care."[17] This rule is in harmony with the well-established principle that there is generally no duty to keep a natural stream in a safe condition.[18]

■■■■ Focusing upon Swenson Dam does not assist plaintiffs for several reasons. First, under Utah law, the attractive nuisance doctrine only applies to conditions that are artificial and *uncommon*.[19] Absent some special danger, this Court does not apply the attractive nuisance doctrine to water hazards. In other words, the attractive nuisance doctrine is not applicable to artificial bodies of water "having natural characteristics and no hidden dangers not ordinarily found in such bodies of water."[20] There is no evidence in the record

**15.** 93 C.J.S. *Waters* § 4(b) (1956) (footnotes omitted). *See also* 78 Am.Jur.2d *Waters* § 5 (1975) ("A [natural] watercourse does not lose its character as such by reason of the fact that it is improved by deepening, or is artificially controlled, nor because it is used as a conduit to carry other waters.") (footnote omitted). *Cf. Charvoz v. Salt Lake City,* 42 Utah 455, 131 P. 901 (1913). *But see* Restatement (Second) of Torts § 363 comment b (1965).

**16.** *E.g., Glover v. City of Mobile,* 417 So.2d 175, 178–79 (Ala.1982); *Montega Corp. v. Grooms,* 128 Ga.App. 333, 337, 196 S.E.2d 459, 462 (1973). *See Haden v. Hockenberger & Chambers Co.,* 193 Neb. 713, 716, 228 N.W.2d 883, 885 (1975). *Accord Byrd v. Melton,* 259 S.C. 271, 276–77, 191 S.E.2d 515, 517 (1972). *See generally* Annot., 8 A.L.R.2d 1254, 1373–74 (1949); Annot., 36 A.L.R. 34, 262 (1925); Restatement (Second) of Torts § 339 comments j & p (1965).

**17.** *Brown v. Salt Lake City,* 33 Utah 222, 237, 93 P. 570, 575 (1908) (*quoting Peters v. Bowman,* 115 Cal. 345, 356, 47 P. 598, 599 (1897)).

**18.** *See, e.g., Sehy v. Salt Lake City,* 41 Utah 535, 537–38, 126 P. 691, 692 (1912).

**19.** *Brown,* 33 Utah at 240, 93 P. at 576. *See Eaton v. Savage,* 28 Utah 2d 353, 354, 502 P.2d 564, 565 (1972); *Featherstone v. Berg,* 28 Utah 2d 94, 95, 498 P.2d 660, 661 (1972); *Taylor v. United Homes, Inc.,* 21 Utah 2d 304, 305, 445

P.2d 140, 141 (1968). The Restatement has been similarly limited. *See, e.g.,* Restatement (Second) of Torts § 339 (1965). Comment j:

There are many dangers, such a[s] those of fire and water, or of falling from a height, which under ordinary conditions may reasonably be expected to be fully understood and appreciated by any child of an age to be *allowed at large.* To such conditions the rule stated in this Section ordinarily has no application, in the absence of some other factor creating a *special risk* that the child will not avoid the danger, such as the fact that the condition is so hidden as not to be readily visible, or a distracting influence which makes it likely that the child will not discover or appreciate it.

Where, however, the possessor knows that children too young to appreciate such dangers are likely to trespass on his land, he may still be subject to liability to such children under the rule stated.

(Emphasis added.) *Harmon v. Billings Bench Water Users Ass'n,* 765 F.2d 1464, 1465 (9th Cir.1985). *See also* Restatement (Second) of Torts § 339 comment i (1965) (risks children can be expected to appreciate) and comment p (natural conditions).

**20.** *Ochampaugh v. City of Seattle,* 91 Wash.2d 514, 520, 588 P.2d 1351, 1355 (1979) (en banc). *Cf. Limberhand v. Big Ditch Co.,* 706 P.2d 491, 494–96 (Mont.1985) (held upon similar facts at-

that Swenson Dam in any way increased the natural hazards which caused plaintiffs' injuries. Moreover, the record does not indicate that Springville City and Irrigation Co. are owners or possessors of Hobble Creek.

■ Second, even if we assume that Springville City and Irrigation Co. were hosts to an attractive nuisance, plaintiffs, as a matter of law, are not entitled to reversal in this case. As indicated above, an essential element in a negligence action is that the plaintiff establish the necessary connection between the defendant's negligence and the plaintiff's injury. A plaintiff's inability to establish evidence of factual cause is fatal to his or her negligence claim. The classic formulation for determining factual cause is that a defendant's negligent act or omission must be a necessary antecedent to the plaintiff's injury.[21] In this case, plaintiffs have failed to produce any evidence that Jonathan would not have drowned but for Springville City's and Irrigation Co.'s maintenance of the Swenson Dam area. Professor Prosser states:

> On the issue of the fact of causation, as on other issues essential to the cause of action for negligence, the plaintiff, in general, has the burden of proof. The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.[22]

In their brief, plaintiffs concede that "a determination of the exact location where Jonathan Weber fell into the creek is admittedly not possible." However, plaintiffs claim, both in their brief and at argument, that they have established a sufficient evidentiary foundation to show the *approximate* location of where Jonathan entered the stream. Specifically, plaintiffs refer to submitted evidence regarding Jonathan Weber's age, the various routes he could have taken to the water's edge, and the amount of time that elapsed from the time he was first missed until he was pulled from the river. Plaintiffs characterize this evidence as circumstantial and claim that such evidence infers that Jonathan fell into Hobble Creek at Swenson Dam. However, it is obvious that derivation of such an inference requires sheer speculation. This

tractive nuisance doctrine not applicable to artificial stream or body of water with natural characteristics, but fashioning new rule imposing duty upon possessors of such artificial streams and ponds if there is a hidden trap or risk involved).

Plaintiffs claim that Springville City has, by enactment of the Springville City, Utah, Ordinance § 12-2-4, superseded the common law definition of "attractive nuisance." The ordinance provides in pertinent part:

> It shall be unlawful to cause, create, maintain or be the author of an attractive nuisance within the City. Any vacant lot or open area of ground into which the public, and particularly children, has access within which any of the following conditions occur is an attractive nuisance: (1) ponding or impounding of water....

Although Springville City has broad powers to enact necessary measures to promote the general health, safety, morals and welfare of its citizens, *see State v. Hutchinson*, 624 P.2d 1116, 1126 (Utah 1980), it may not dictate the outcome of the balancing approach utilized when applying the attractive nuisance doctrine in civil cases. Since this Court has left this process to the trial courts and juries of this state, Springville's ordinance facially appears to be inconsistent with state law. However, it does not appear that Springville City intended the ordinance to define "attractive nuisance" in the civil case context. The Springville City Code indicates that this section was enacted based on authority found at U.C.A., 1953, § 10-8-60 (Repl.Vol. 2A, 1973 ed.). That section provides: "They may declare what shall be a nuisance, and abate the same, and impose fines upon persons who may create, continue or suffer nuisances to exist." Springville City's reference to this provision implies that it intended to define "public nuisances" and not "attractive nuisances," as that term is used in simple negligence theory cases.

21. W. Keeton & W. Prosser, *Prosser and Keeton on the Law of Torts* § 41, at 265 (5th ed. 1984).

22. *Id.* at 269 (footnotes omitted).

observation is borne out by plaintiffs' brief. Therein, they list several reasons to show why Jonathan may have fallen into the river at or near Swenson Dam, including: (1) Seventh East was the nearest crossing to plaintiffs' apartment; (2) the dam was the easiest access point on the south side of Hobble Creek; (3) Swenson Dam was the entry point to the stream closest to the apartment house; and (4) Donald Weber, when he noticed that his son was missing, took the path to Swenson Dam. In a different portion of their brief, plaintiffs speculate just the opposite:

> He could have gone up the hill to the bridge on the east side of the complex, past the bridge to the church parking lot, and then gone down to Hobble Creek and fallen in, but considering the child's age, his lack of familiarity with the surroundings, and the short time between when he was missed and when he was rescued, it is more probable that he went into the backyard, and either through a hole or through the opening where the gate should have been along the well-worn path to Hobble Creek.

Plaintiffs' evidence merely shows a possibility of causation, and as noted above, this is not enough.

Plaintiffs clearly realize their predicament and ask this Court to solve the problem by placing upon the two defendants the burden of proof on the issue of causation. Plaintiffs rely on the case of *Summers v. Tice* [23] for this theory. In that case, two defendants negligently discharged shotguns that were pointed at the plaintiff, and the plaintiff was struck by only one blast that might have been fired from either gun. Thus, it was clear that both defendants were negligent and that one of them, and only one of them, had caused the injury. Instead of dismissing the plaintiff's action, the California Supreme Court solved the problem by placing upon both defendants the burden of proof on the issue of causation. In discussing *Summers v. Tice*, Professor Prosser states:

> It seems a very desirable solution where negligence on the part of both defendants is clear, and it is only the issue of causation which is in doubt, so that the choice must be made between letting the loss due to failure of proof fall upon the innocent plaintiff or the culpable defendants. But where there is no evidence even as to where culpability lies, the hardship may be equally great upon an innocent defendant; and except in very special cases [none of which are applicable here] the courts have refused to shift the burden of proof. [24]

In this case, the *Summers v. Tice* doctrine simply does not apply because plaintiffs failed to bring all of the potential tort-feasors before this Court. Instead, plaintiffs sought and obtained a dismissal of their appeal against Biesinger and did not appeal the lower court's decision as to defendants Law. Nor did plaintiffs sue other individuals who own property abutting the stream in the area.

For the reasons stated above, the lower court's judgment is affirmed. Costs to defendants.

STEWART, DURHAM and ZIMMERMAN, JJ., concur.

HOWE, J., concurs in the result.

---

23. 33 Cal.2d 80, 199 P.2d 1 (1948).

24. W. Keeton & W. Prosser, *Prosser and Keeton on the Law of Torts* § 41, at 265 (5th ed. 1984).