[Civ. No. 2963. First Appellate District, Division One.—December 22, 1919.]

## JOHN F. FAYLOR, Respondent, v. GREAT EASTERN QUICKSILVER MINING COMPANY (a Corporation), Appellant.

[1] NEGLIGENCE—ATTRACTIVE CONTRIVANCES—DUTY OWING TO CHILDREN.—Those who place an attractive but dangerous contrivance in a place frequented by children, and knowing, or having reason to believe, that children will be attracted to it and subjected to injury thereby, owe the duty of exercising ordinary care to prevent such injury to them, because such persons are charged with knowledge of the fact that children are likely to be attracted thereto and are usually unable to foresee, comprehend, and avoid the danger into which they are thus knowingly allured.

[2] ID.—DEATH OF CHILD ON MINING PROPERTY—DANGEROUS AND ENTICING TRAP—ORDINARY CARE—INTELLIGENCE OF CHILD—QUESTIONS FOR JURY.—In an action for damages for the death of a minor son caused by his having fallen into a stope driven up through the floor of a tunnel in a mine, the ultimate question as to whether this was a trap enticing and dangerous to children, and whether the defendant exercised ordinary care in failing to close the mouth of the tunnel or otherwise to prevent children from wandering therein while playing with the cars, and from falling into the stope, and whether the deceased child was old enough and intelligent enough to anticipate, apprehend, and understand and to avoid the danger, are questions which are usually to be determined by the jury.

[3] ID.—ATTRACTIVE NUISANCE—EVIDENCE—FINDING.—In this action for damages for the death of a minor son caused by his having fallen into a stope driven up through the floor of a tunnel in a mine while playing with certain cars used in working the mine, the jury had sufficient evidence before it to justify a finding that the car, tunnel, and stope, taken together, did constitute an attractive nuisance within the general rule of the turntable cases.

1. Attractive nuisances, note, 19 L. R. A. (N. S.) 1094.

2. Liability of mine owner for injuries resulting from unguarded excavation, note, Ann. Cas. 1916E, 484.

3. Liability of railroad companies for injury to children playing on turntables, notes, 14 L. R. A. 781; 4 L. R. A. (N. S.) 80; 16 L. R. A. (N. S.) 1129.

Contributory negligence of child injured on turntable, note, L. R. A. 1917F, 111.

[4] ID.—CONTRIBUTORY NEGLIGENCE—BURDEN OF PROOF—EVIDENCE.—
The burden of proving contributory negligence rests on the de-
fendant; and in this action for damages for the death of a minor
son caused by his having fallen into a stope driven up through the
floor of a tunnel in a mine, the jury was justified in finding from
the evidence that this burden was not met.

APPEAL from a judgment of the Superior Court of
Sonoma County. Emmet Seawell, Judge. Affirmed.

The facts are stated in the opinion of the court.

Geary & Geary for Appellant.

W. F. Cowan and Carl Barnard for Respondent.

BEASLY, P. J., *pro tem.*—This is an appeal by the de-
fendant from a judgment against it based upon an adverse
verdict of a jury in an action for the death of John Rich-
ard Faylor, a minor. The action is prosecuted by the boy's
father. The verdict was for five thousand five hundred
dollars, and on motion for a new trial the court indicated
its intention to grant the motion unless the plaintiff should
agree to a reduction of the verdict to the sum of $4,250.
This condition was met by plaintiff and the motion for a
new trial was accordingly denied. The facts are stated
in the opening brief of appellant's counsel as follows:

For more than thirty years the defendant has operated
a quicksilver mine about three miles from Guerneville, in
Sonoma County. The mining property was part of a large
tract of land and was inclosed with a barbed wire fence.
A public road passed near the property, and a large gate
in defendant's fence permits travel between defendant's
property and the county road. This fence and gate are
about twenty-five feet from the county road. Posted in a
conspicuous place on said gate was a sign six feet long
and eighteen inches wide, and with the word "Danger"
painted thereon in letters one foot high and the words
"No Admittance" about eight inches high. About a half
mile from defendant's property the plaintiff and his family,
which included the deceased, resided, and opposite his
dwelling was situated the public school attended by de-
ceased. It was not necessary for deceased or any of plain-

tiff's children to pass near or through defendant's property in going to or from school. The mine has been operated about thirty years. In working it a tunnel about five hundred or six hundred feet long was driven into the ore body. This tunnel was known as the "old tunnel," and was about four feet wide. Two rails were laid in said tunnel about two feet apart and extending through the mouth of said tunnel and across a practically level part of the property to the crushing plant, situated about 150 feet from the mouth of the tunnel. In moving ore from the mine small cars two feet long and about eighteen to twenty inches wide, consisting of four wheels and a box-bed, were run on these tracks. There was a slight fall from the inside of the tunnel and the cars were easily pushed along the rails by the workmen. Some thirteen or fourteen years ago, in working the mine, a stope was driven up through the floor of the tunnel. Where this break occurred, and where ore tracks passed over the stope, planks were laid, one two by twelve inch board between the rails and a similar board on each side of the rail, and, as so constructed, it was safe to push the cars over the rails, and the tunnel was so used for many years. The workmen continually passed back and forth over this part of the tunnel, walking on these boards, and it was considered safe. During the winter of 1916–17, by reason of a cave occurring near the mouth of this old tunnel, it was impossible to use the part of it extending in about seventy-five feet from the mouth thereof, and a short tunnel, called the branch tunnel, was driven in about fifty feet to intersect this old tunnel beyond the caved-in part, and during the year 1917 and part of 1918 all ore extracted from the mine was moved out over this short tunnel to the crusher. The rails in the old tunnel between its mouth and its junction with the branch were removed, and at the time of the accident to John Richard Faylor there were no rails thereon and no cars could be moved through the mouth of the old tunnel. When the mine was not being operated these little cars were left near the mouth of the tunnel which was in use. On Sunday, the third day of February, 1918, no work being then done in or about said mine, the deceased, an intelligent boy eleven years old, together with his brother and a boy named Ewan, went in upon the mining property to

play.  John Faylor ran the little car upon the track into the branch tunnel to the junction with the main tunnel once or twice and left it there, and instead of returning the way he entered, passed into the old tunnel and proceeded toward the mouth thereof.  His body was afterward found in the stope.  At the junction of the main tunnel and the branch tunnel there was a large timber in the center of the main tunnel which one proceeding toward the mouth of the old tunnel would have to pass around.  It was also obstructed by a pile of dirt and debris two feet high and by a pipe-line extending across it.

The following additional evidence, some of it contradictory to defendant's above-recited statement, is pointed out by appellant, namely, that the father of the deceased had been employed at the mine for many years, and that occasionally the deceased, with the children of other miners, would go upon the grounds to see their parents, but that they never at such times played with the cars and had never entered the tunnels; that orders had been given by the managers of the mine to all their employees not to permit anyone within the place; and that the deceased and other children had been ordered off the premises by a Mr. Roeth, an employee of the appellant, who drove them out and told them to get out and stay out; that the father of the deceased had told his children that it would be dangerous for them to go in the tunnels or to play on the cars; that a foreman of the mine had seen two boys playing with the car and took it away from them and told them not to play there; that the children had played with the cars on the Sunday on which John Faylor was killed; that the Faylor children had been driven out of the mine about a month before the accident; that Johnnie Faylor, the deceased, had been ordered off the grounds several times by one Clyde Ayers, who stated he did not know on how many occasions he had done this; and that the tunnel and stope were an integral part of the mine and necessary to properly work the same.

The following additional evidential facts are pointed out by the respondent: The mine where the deceased met his death was partly inclosed by a fence on the northwest side, and is located within about one hundred feet from the hoist, from which entrance is made on to the mining property

through a gate. It was easy to enter the mining property through the fence, and a road leads from this gate over and across the mining property, which at an earlier date had been used as a public road. Upon this road school-children living beyond the mine, prior to and at the time of the injury, would travel and would cross the mining property, in going to and returning from school, located about one-half mile from the mine. On Saturdays and Sundays and after school and during the noon hour school-children and children of the neighborhood would go upon the mining property to play. One Louis Bonnacarsi testified that he had seen children at the mine for a year or more playing with the cars; that they usually played around there like most children would around a place like that, and that often he had seen them playing with the cars; that they would run them up into the tunnel a ways and ride out on them, and sometimes some of the little boys would get in the cars and others would give them a start and ride on the trucks behind while the cars ran down toward the dump. On account of the cave-in at the mouth of the old tunnel the old tunnel had been for a time in disuse, but at and prior to the date of the death of John Faylor the debris had been removed, so that the entrance was unobstructed. The tracks of the car-line had been replaced at the time of the injury up to the stope where young Faylor met his death, which before the earthquake was built up from below the 140-foot level into and through the floor of the old tunnel at a point about fifty feet from the entrance. This stope was about five hundred feet deep and was filled with water below the 140-foot level at the time young Faylor met his death therein. It had not been used in the mining operations for a number of years and was abandoned, and at the time of the death of deceased and for some months prior thereto the stope was open and unprotected. It was dangerous, for miners had been warned to avoid the stope and feared to go into the tunnel on account of the stope. There was no watchman at the mine and there were no lights in the main tunnel. Outside the two tunnels mentioned, and near by, was the hoisting shaft and pump. The track out of the branch tunnel ran near the hoist and down to the dump, and four cars were pushed and operated over the track. These cars

could be pushed or shoved by children. None of these cars had blocks or other fastenings except a foot-brake. When not in use the cars were left standing on the tracks outside the tunnels, unblocked, unfastened, uninclosed, and unguarded, and they were in this condition and uninclosed on Sunday, February 3, 1918, when the deceased met his death.

On that date the deceased and his brother Fred and another boy named Gilbert Ewan went upon the premises and played with two of the cars, one of the larger cars and the flat car. Clyde Trine, an employee of defendant and appellant, helped Fred Faylor and Gilbert Ewan push the large car, and the deceased pushed the flat car into the tunnel. After stopping at the water bucket for a drink, Fred Faylor and Gilbert Ewan pushed the big car and the deceased pushed the flat car back into the new tunnel at the junction. One of the cars left the track near the junction, and they heard the Faylor girls at the entrance of the tunnel, and Fred Faylor and Gilbert Ewan hid behind the car at the junction of the tunnels, and deceased started out of the old tunnel. John Faylor was never again seen alive, and his body was subsequently recovered from the stope. Finger-prints were discovered on the side wall at the opening of the stope. The parents did not know their children played with the cars nor around the tunnels or mine, nor did they know that they were going to play at the mine that day.

Upon these facts the respondent obtained a verdict, as above stated, upon the theory that the cars, tunnels, and stopes constituted an attractive and dangerous nuisance under the rule laid down in the turntable and kindred cases; and the appellant claims that the facts do not bring the case within that rule.

The rule in California has been stated as follows: [1] Those who place an attractive but dangerous contrivance in a place frequented by children, and knowing, or having reason to believe, that children will be attracted to it and subjected to injury thereby, owe the duty of exercising ordinary care to prevent such injury to them, because such persons are charged with knowledge of the fact that children are likely to be attracted thereto and are usually unable to foresee, comprehend, and avoid the danger into which

they are thus knowingly allured. (*Barrett* v. *Southern Pacific*, 91 Cal. 296, [25 Am. St. Rep. 186, 27 Pac. 666]; *Pierce* v. *United Gas & Electric Co.*, 161 Cal. 180, [118 Pac. 700]; *Cahill* v. *Stone & Co.*, 153 Cal. 571, [19 L. R. A. (N. S.) 1094, 96 Pac. 84].)

One theory on which this rule seems to be predicated is that the attractiveness of the dangerous contrivance or machinery raises an implied invitation to children to go upon the property. The rule of implied invitation is thus stated in *Brown* v. *Salt Lake City*, 33 Utah, 222, [126 Am. St. Rep. 828, 14 Ann. Cas. 1004, 14 L. R. A. (N. S.) 619, 93 Pac. 570] : "If, therefore, the owner places something upon his premises which is easily accessible to children, and which is alluring and attractive to their childish propensities, and excites their curiosity and desire for play, it in effect amounts to an implied invitation to them to come upon the premises." By reason of this implied invitation such cases are sometimes said to be within the general and well-settled rule of law that the owner, or occupant, of lands or buildings, who by invitation, express or implied, induces persons to come upon his premises, is under a duty to exercise ordinary care to render the premises reasonably safe for them. This general rule is correctly stated in *Herzog* v. *Hemphill*, 7 Cal. App. 116, [93 Pac. 899]; *Means* v. *Southern Pacific Ry. Co.*, 144 Cal. 473, [1 Ann. Cas. 206, 77 Pac. 1001], and *Giannini* v. *Campodonico*, 176 Cal. 548, [169 Pac. 80], and it is accordingly and logically held that it constitutes want of ordinary care to knowingly maintain in such places, where attractive contrivances to the knowledge of the owner invite children to play, a dangerous piece of machinery or other trap or snare for them, and that ordinary care in such cases may only be exercised by taking into consideration the propensities of the children who play there, the ability of such children to appreciate the danger, and their power to avoid it, and so protecting them reasonably from the danger; and in this connection there are certain qualifications of the rule to be hereinafter mentioned. The questions of the particular child's ability to appreciate the danger, and his power to avoid it, are usually questions of fact for the jury.

But there is another and more generally accepted theory on which the turntable and kindred attractive nuisance

cases are rested, to wit, that, although the children are trespassers, these cases constitute an exception to the general rule that the owner of property owes no duty to mere trespassers to keep his property in a safe condition (*Peters* v. *Bowman,* 115 Cal. 345, [56 Am. St. Rep. 106, 47 Pac. 113, 598] ; *Malloy* v. *Hibernia Savings etc. Soc.,* 3 Cal. Unrep. 76, [21 Pac. 525] ; *Loftus* v. *Dehail,* 133 Cal. 214, [65 Pac. 379] ), and this because the cases arise out of "instances where the owner maintains on his land something in the nature of a trap, or other concealed danger, known to him, and as to which he gave no warning to others." This language is quoted from the opinion of Mr. Justice McFarland in *Peters* v. *Bowman, supra.* The exception to the general rule that an owner owes no duty to protect trespassers which is established by the turntable cases, and is known as the attractive nuisance doctrine, is stated, with some of the qualifications above referred to, by the late Chief Justice Beatty in *Peters* v. *Bowman, supra,* as follows: "The owner of a thing dangerous and attractive to children is not always and universally liable for an injury to a child tempted by the attraction. His liability bears a relation to the character of the thing, whether natural or common, or artificial and uncommon, to the comparative ease or difficulty of preventing the danger without disturbing or impairing the usefulness of the thing, and in short to the reasonableness and propriety of his own conduct, in view of all the surrounding circumstances and conditions. As to common danger existing in the order of nature, it is the duty of parents to guard and warn their children, and failing to do so, they should not expect to hold others responsible for their want of care. But with respect to danger specially created by the act of the owner, novel in character, attractive and dangerous to children, easily guarded and rendered safe, the rule is and ought to be different."

In an exceptionally thoughtful opinion by the supreme court of Utah (*Brown* v. *Salt Lake City, supra*), this language of the chief justice is quoted with unstinted approval, and that court discussed fully the whole subject, and after so quoting and approving the above language of the late chief justice in *Peters* v. *Bowman, supra,* that court held that the rule as there stated applied to a water conduit

maintained by Salt Lake City, wherein the danger was concealed, and in which a schoolboy, while playing, was drowned. The conduit was closed, and, in principle, the facts of the case cannot be distinguished from those of the case now under discussion.

Counsel for appellant insists that *Peters* v. *Bowman, supra, Nicolosi* v. *Clark,* 169 Cal. 746, [L. R. A. 1915F, 638, 147 Pac. 971], *Loftus* v. *Dehail, supra,* and *Polk* v. *Laurel Hill Cemetery Assn.,* 37 Cal. App. 624, [174 Pac. 414] determine this case, and that under those cases the rule of the turntable cases cannot be extended to the facts developed by the evidence in this case. But we cannot agree with counsel in this contention. It was held in *Peters* v. *Bowman* that a body of water, either standing as in ponds and lakes or running as in rivers and creeks, or ebbing and flowing, as on the shores of seas and bays, is a natural object incident to all countries which are not deserts; that the danger of drowning in it is an apparent open danger, the knowledge of which is common to all; and that there is no just view consistent with recognized rights of property owners which would compel one owning land upon which such body of water stands or flows, to fill it up, or surround it with a wall, and that while in that case the pond was an artificial pond, the same rule would be applied to it that would be applied generally to natural bodies of water, and justly, for the reason that the danger was not a concealed danger and that children from birth are taught, generally speaking, to avoid the danger of drowning, at least when the danger is open to their eyes.

*Loftus* v. *Dehail, supra,* was a case where the danger, an open cellar on a vacant lot, from which the house which had covered the cellar had been moved, was held not to be a concealed danger, and, further, the injured child was found to have been pushed into the cellar by another child, whose act was held to be the proximate cause of the injury.

In *Nicolosi* v. *Clark, supra,* a boy of ten years stole a box of dynamite caps from a tool-box used by a street contractor to store tools, and, not knowing that they were dangerous, exploded one of the caps, to his injury. It was held upon the facts that the boy was shown to have been guilty of contributory negligence, but the following language of the opinion is illuminating: "If a boy of ten years

of age is not chargeable with knowledge that he has no right
to make free with the . contents of a box placed such as
this, manifestly a box belonging to other people, and con-
taining their goods, it can only be because that particular
boy is of deficient intellect and understanding.''

In *Polk* v. *Laurel Hill Cemetery Assn., supra,* the rule
of the turntable cases was applied to a reservoir of water
in which a child was drowned, apparently because the reser-
voir was so concealed as to be dangerous to persons passing
near it, as the following language of the complaint indicates:
''That it was dangerous to all persons passing near the
same, because the turf and ground sloped up to the edge
thereof, so that any person walking or standing near the
edge of said reservoir was without protection and without
notice of proximity to a place of danger and was with-
out any warning sign or indication that said place was
dangerous.''

In all these cases, except *Polk* v. *Laurel Hill Cemetery
Assn.* the danger was either so open that the injured child
was held to have been able to see it, or so obvious that the
particular child was held accountable for understanding the
danger, and in Polk's case the defendant was held answer-
able because the danger was concealed.

And so far as we have been able to examine the au-
thorities, the rule as laid down by the chief justice in
*Peters* v. *Bowman, supra,* will be found to explain every
case where relief has been denied in the states where the
attractive nuisance doctrine is recognized.

But the case at bar is distinguished from all the cases in
our own, and so far as our attention has been called to
them, in other jurisdictions recognizing the rule where re-
lief has been denied trespassing children injured by the
condition of machinery or premises, for in the case at bar
the danger was distinctly a concealed danger. The bait
of the trap may be said to have been the push-car, in itself
an attractive lure to boys of the age of John Faylor. The
tunnel, which, like any cave, natural or artificial, has been
both in fiction and in fact, in their reading and in their
play, since the days of Ali Baba, Robinson Crusoe, and
the Count of Monte Cristo, irresistibly attractive to boys,
and the concealed stope in the dark tunnel five hundred
feet deep and filled with water, was the trap into which the

tunnel and cars led the boy's unwary feet. From the evidence in this case, the company knew that the children played about this mine. It must be taken to have been known to the defendant that its machinery was attractive to adventurous and playful children. It knew certainly of the open and unprotected stope in the dark tunnel near the end of the car-line, and it must be held to the duty of recognizing the ordinary propensities of boys to play therein, their love of adventure, which the defendant must be held to have anticipated, would lead them into the tunnel, and the lurking danger against which the company might have simply provided by closing the tunnel when it was, as at the time of the death of John Faylor, not working the mine, and had no watchman there to guard it. The evidence certainly is sufficient, from a legal standpoint, to sustain a finding bringing this case within the attractive nuisance doctrine.

[2] The ultimate question as to whether this was a trap enticing and dangerous to children, and whether the company exercised ordinary care in failing to close the mouth of the tunnel or otherwise to prevent children from wandering therein while playing with the cars, and from falling into the stope, and whether the deceased child was old enough and intelligent enough to anticipate, apprehend, and understand and to avoid the danger were questions which are usually to be determined by the jury. (*Brown* v. *Salt Lake City, supra.*) [3] We think the jury had sufficient evidence before it to justify a finding that the car, tunnel, and stope, taken together, did constitute an attractive nuisance within the general rule of the turntable cases, and in reply to the statement that no case has been found extending the doctrine to such a state of facts as this, it may be said in passing that, as has been shown, the rule has been applied to cases other than machinery, and, further, that while matching cases is an interesting mental recreation, it is not by matching cases, but by the correct application of sound legal principles, that a case such as this is best determined, and that in at least one able decision, the rule has been applied to a state of facts very similar to those of the instant case—*Brown* v. *Salt Lake City, supra.*

[4] The burden of proving contributory negligence rested on the defendant. We think an examination of the facts

above recited will show that the jury were justified in finding from the above evidence that this burden was not sustained.

We are satisfied that the evidence sustained the verdict, and that the judgment should be affirmed, and it is so ordered.

Richards, J., and Kerrigan, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 19, 1920.

Angellotti, C. J., Lawlor, J., Lennon, J., and Kerrigan, J., *pro tem..* concurred.