[Civ. No. 2707. Third Appellate District.—March 20, 1924.]

HENRY SANDBERG, Respondent, v. THE McGILVRAY-RAYMOND GRANITE COMPANY (a Corporation), et al., Appellants.

[1] NEGLIGENCE—RAILROAD TRAIN—ATTRACTIVE NUISANCE—EVIDENCE —MATURITY OF CHILD.—In this action for damages for the death of the minor son of plaintiff, who was run over by one of the cars of a train being operated by defendant granite company, the evidence showing the construction and make-up of the train, the manner of its operation, the slowness of its motion, the number of men in the operating crew, and their relative stations on the train, was sufficient to justify the implied finding of the jury that the train was an attractive nuisance; and the question whether said child was sufficiently advanced in years and intelligence to

---

1. Contributory negligence of children, notes, 1 Ann. Cas. 895; 17 Ann. Cas. 353; Ann. Cas. 1913A, 117; Ann. Cas. 1913B, 964; L. R. A. 1917F, 42. See, also, 20 R. C. L. 124.

Doctrine of attractive nuisance generally, note, 19 L. R. A. (N. S.) 1094. See, also, 20 R. C. L. 79.

be classified as a willful trespasser and to foresee and comprehend the danger was a question of fact to be determined by the jury.

[2] Id. — Failure to Exercise Ordinary Care — Inferences — Evidence.—In such action, there having been ample evidence to justify the inference that the boy was injured while playing upon or about the moving car and that he would not have been there but for the failure of defendant granite company to exercise ordinary care in the discharge of its duty to childhood, the manner in which the accident occurred was immaterial.

[3] Id.—Attractive Nuisances—Application of Doctrine to Railroad Trains.—Conceding that the doctrine of attractive nuisances does not apply to railroad cars moving forward in the ordinary way, where the train is not moving forward in the ordinary way so that the engineer would naturally see any person on or about the track, but is being backed very slowly, the end of the car farthest away being nearly a hundred feet from the positions of the engineer and brakeman (who constitute the crew), neither of whom can see the cars or the track in the direction in which they are going, and the duties of the brakeman, at least, not being such as in any manner to prevent his keeping the cars and track under his observation, the rule with reference to trains moving forward in the ordinary way does not apply.

[4] Id.—Erroneous Instruction — Absence of Prejudice. — In this action for damages for the death of the minor son of plaintiff, who was run over by one of the cars of a train being operated by defendant granite company, it was error to instruct the jury that "if you find by a fair preponderance of the evidence that" the deceased, "whose age was eight years, eight months, and fifteen days when the accident occurred, was possessed of a judgment too immature to appreciate the danger in his climbing, riding, and playing upon said cars, then I charge you that it was the duty of the defendant corporation to have exercised reasonable care to prevent his so doing," as such instruction made the defendant liable whether the cars were attractive to children or not; but in view of the other instructions given, and the almost conclusive character of the evidence tending to show that the train, as operated, was attractive to children, the defendant was not prejudiced by the giving of such erroneous instruction.

[5] Id.—Loss Suffered by Wife—Recovery by Husband.—In an action by the father for damages for the death of his minor son, the father is entitled to recover not only the pecuniary loss suf-

---

3. Doctrine of attractive nuisance as applicable to standing railway cars, note, Ann. Cas. 1912D, 916. See, also, 20 R. C. L. 92.

5. Measure of damages recoverable by parent for death of minor child, notes, Ann. Cas. 1912C, 58; Ann. Cas. 1916B, 532. See, also, 8 Cal. Jur. 1016; 8 R. C. L. 835.

fered by himself, but also that suffered by his wife (the mother of the deceased child); and the jury is properly so instructed.

[6] ID.—DEATH OF MINOR—ACTION FOR DAMAGES—PARTIES PLAINTIFF. Section 376 of the Code of Civil Procedure, in so far as it authorizes the husband to maintain an action for the death of a minor child, is framed upon the theory of the continuance of the marital community, the husband being the representative thereof for the purpose of maintaining the action; and there is no necessity for joining the wife as a party plaintiff. (On denial of rehearing.)

---

(1) 33 Cyc., pp. 889, 905.   (2) 29 Cyc., p. 447 (1926 Anno.). (3) 33 Cyc., p. 774.   (4) 4 C. J., p. 1029, sec. 3013; 33 Cyc., p. 915. (5) 17 C. J., p. 1318, sec. 188.   (6) 17 C. J., p. 1274, sec. 125.

APPEAL from a judgment of the Superior Court of Madera County. Stanley Murray, Judge. Affirmed.

The facts are stated in the opinion of the court.

B. M. Aikins for Appellants.

Fee & Ring, G. W. Raburn and Gallaher, Simpson & Hays for Respondents.

FINCH, P. J.—This appeal is from a judgment in favor of plaintiff for the death of his minor son, alleged to have been caused by the negligence of defendants in the operation of a railroad train. The defendants Whitfield and Beach were the engineer and brakeman, respectively, in charge of the train, which was being operated by the defendant corporation. The corporation will be referred to as the defendant.

At the time of the accident the defendant was, and for many years prior thereto had been, engaged in the operation of a granite quarry. It also operated a railroad running from the quarry to the line of the Southern Pacific Company, a distance of between one-half and five-eighths of a mile, usually making one round trip a day. The greater part of this short railroad from the Southern Pacific line up to the quarry is on a grade of about five and a half per cent. The train consisted of a locomotive, called a "dago" by the witnesses, and two flat cars. The defendant's superintendent described the dago as follows: "It is a locomotive crane, commonly called a wrecking crane, and it is a machine

---

6. Parent's statutory right of action for death of child, note, L. R. A. 1916E, 120. See, also, 8 Cal. Jur. 950; 8 R. C. L. 727.

that weighs about, I think the machine figures 36 tons. It has two cylinders, eight by ten cylinders, which exhaust into the open, and naturally very noisy.'' The crane is used to load blocks of granite. The dago cannot be run at a speed exceeding one mile an hour, even on a down grade. It takes more than an hour to make the trip from the Southern Pacific line to the quarry. The cars were of the ordinary type used on broad-gauge tracks. The dago was at the head of the train on the down trips and the return trips to the quarry were made by backing the dago, preceded by the empty cars. It was with difficulty that the cars were pushed up the steep grade by the dago. It was the custom to start with 125 pounds of steam and to stop when it dropped to 90 pounds until the pressure could be increased. On so stopping the brakeman would block the car next the dago to prevent the train from running back down the grade.

Near the quarry were the homes of men employed in various capacities by the defendant. Leading from the quarry to a point near the district schoolhouse, on the county road beyond the Southern Pacific line, was a private wagon road near to and generally parallel with defendant's railroad and crossing it at one point. Between the wagon road and defendant's railroad was a footpath. Children going to and from school and other persons were accustomed to walk along the wagon road, the footpath, and defendant's railroad. The brakeman testified that he had frequently seen children along the track, ''going down to school and coming back,'' and around the cars, and on the cars and had made ''them get off whenever we saw children.'' Defendant's superintendent testified: ''There is a part of that track that the public use, and it is an impossibility to keep them off of it. The private road parallels the railroad track. . . . I have seen the track used by people there, both children and adults. . . . If the road happens to be muddy, the people will naturally get up on the embankment where they are out of the mud.'' He further stated that he had ''seen children playing about that track, and upon it''; that he had been told that children ''were down there, probably trying to get on the cars, but not playing on the cars''; that Mr. Krohn, assistant superintendent, ''has licked his boy whenever he has found him down there, and I have refrained from telling Mr. Sandberg, because I knew that Mr.

Sandberg licked his boy very severely, and knowing the child as well as I did, I felt that I should not tell his father, because it meant quite a licking for the boy''; that he had warned the brakeman and engineer to keep the children off the cars, to ''put them off, and warn them off, and keep them off''; and that ''everybody knew Jim Beach, and Jim is a man who is very easy-going and the fact of the matter is, it would have taken Jim Beach and Toughy [the engineer] constantly putting children off the car if they would allow them down there at all.'' One witness for the plaintiff testified that he had frequently seen children walking along the track and on two occasions saw them on the cars. Another witness testified that she had seen children walking along the track many times and had many times seen them riding on the cars. A schoolgirl testified that she had seen boys riding on the train on several occasions, some of them on the dago and others on the cars and that she had seen children playing along the track ''pretty often.'' Another schoolgirl testified that she had seen children playing about the track and cars ''pretty nearly every day.'' A schoolboy testified that he had seen children playing on the track and cars ''about five or six times.'' The plaintiff testified that he did not know and had never been informed that his son played on the track or the cars; that he had told the boy not to go on the track or the cars; that he had seen ''lots of other boys walking back and forth the track.'' Mrs. Sandberg testified that she had never heard of her boy riding on the cars, but had seen him thereon once with other boys and that the brakeman was with them, ''but did not tell the boys to get off,'' and that she said to the brakeman: ''Please always keep my child off these cars''; and that she frequently told her boy not to go on the cars.

The plaintiff and his wife and their only child, Sulo, who was of the age of eight years, eight months, and fifteen days, lived in one of the cottages near the quarry. Plaintiff was a stonecutter in the quarry and his wife performed domestic service in the family of defendant's superintendent. Billy Krohn, a boy of about seven years at the time of the accident, is a son of defendant's assistant superintendent. Sulo and Billy were chums. On the morning of the fatal accident the boys left their homes together to get some ice-cream caps which were being given away at a store beyond

the schoolhouse. What occurred thereafter must be told piecemeal as gathered from the testimony of a number of witnesses. Billy was not called as a witness by either party. His father and mother were witnesses for the defendant. Beach testified that as the train, the two cars loaded, approached the Southern Pacific line, he saw the two boys trying to climb on the rear car, but that they did not succeed. The engineer testified that the boys were on the dago when it was standing at the Southern Pacific platform and that he "had to get down and push them off"; that Sulo thereupon "told me to go to hell and mind my own business"; and that on former occasions Sulo had made similar replies when warned to stay away and had thrown stones at the witness. One witness testified that on the morning of the accident she saw the boys riding down on one of the cars; that later she saw the boys riding back towards the quarry on the dago, and that the engineer was about a foot away from them, but that she did not watch them long. One of the schoolgirls hereinbefore mentioned testified that she saw the boys riding down on the cars and saw them again walking about a yard ahead of the train as it was returning towards the quarry. Another witness, a boy of ten years, testified that he saw Sulo and Billy riding on the first car going up the grade; that they threw stones at him from the car "for fun"; that they jumped off the car and on again "a couple of times"; and that the boys were on the car all the way up the hill until the train went around a curve into a cut, in which the accident occurred. The engineer's view of the cars and the track up the grade was obstructed by an upright boiler on the dago and an oil-tank on one side thereof and a water-tank on the other. The brakeman sat on the front, or downgrade, end of the dago, about five feet lower than the engineer, facing down the track. The brakeman testified that neither the engineer nor himself was "in a position to see the track ahead of the flat car" or "whether those boys were on the cars or not." It thus appears that those in charge of the train backed it up the grade without maintaining any more effective lookout in the direction in which it was moving than if they had been blindfolded. When the train was in the aforesaid cut the brakeman left his position on the dago for the purpose of blocking one of the cars and as he reached the end of the

car next the dago he "saw that boy come over from, under the axle" of the other car, the "second axle from the end" which was towards the quarry. The car wheel had passed over the boy's right shoulder and right leg, causing injuries from which he died three hours later. The brakeman testified that Billy was about fifty yards up the track "coming down towards us" at the time of the accident. The engineer testified that Billy was about twenty-five feet up the track. Sulo was an "exceptionally" bright boy in school. He was making two grades in one year and had just been promoted from the third to the fourth grade.

Appellant contends that Sulo was a trespasser and that, therefore, it owed him no duty "except that of not wantonly or willfully injuring him." Under all the foregoing circumstances it might be argued with much plausibility that defendant's act of blindly backing its train up the track in reckless disregard of consequences was wanton. "Wantonness may exist without intent to injure." (*Kramm* v. *Stockton Electric R. R. Co.,* 3 Cal. App. 606, 618 [86 Pac. 738, 903].) The case was tried, however, on the theory that the doctrine of the turntable cases, or the attractive nuisance doctrine is applicable. Appellant urges that the facts of this case do not bring it within that doctrine. Since the doctrine has been approved in some states and repudiated in others, there are numerous cases on both sides of the question. Counsel for the respective parties have cited some 350 of these cases, but it is unnecessary to review any considerable number of them. A few clear definitions of the doctrine will go far toward the solution of the question.

In *United Zinc & Chemical Co.* v. *Britt,* 258 U. S. 268 [66 L. Ed. 615, 42 Sup. Ct. Rep. 299], Mr. Justice Clark said: "The courts of our country have sharply divided as to the principles of law applicable to 'attractive nuisance' cases. . . . At the head of one group . . . has stood the Supreme Court of the United States, applying what has been designated as the 'humane' doctrine. Quite distinctly the courts of Massachusetts have stood at the head of the other group, applying what has been designated as a 'hard doctrine,'—The 'Draconian doctrine.' . . . In 1873, in *Sioux City & P. R. Co.* v. *Stout,* 17 Wall. (U. S.) 657 [21 L. Ed. 745, see, also, Rose's U. S. Notes], this court, in a turntable case, in a unanimous decision, strongly approved the doctrine

that he who places upon his land, where children of tender years are likely to go, a construction or agency, in its nature attractive, and therefore a temptation to such children, is culpably negligent if he does not take reasonable care to keep them away, or to see that such dangerous thing is so guarded that they will not be injured by it when following the instincts and impulses of childhood, of which all mankind has notice.''

In *Cahill* v. *Stone & Co.*, 153 Cal. 571, 574 [19 L. R. A. (N. S.) 1094, 96 Pac. 84, 85], it is said: ''One who places an attractive but dangerous contrivance in a place frequented by children, and knowing, or having reason to believe, that children will be attracted to it and subjected to injury thereby, owes the duty of exercising ordinary care to prevent such injury to them, and this because he is charged with knowledge of the fact that children are likely to be attracted thereto and are usually unable to foresee, comprehend, and avoid the danger into which he thus knowingly allures them.''

In *Mattson* v. *Minnesota etc. R. R. Co.*, 95 Minn. 477 [111 Am. St. Rep. 483, 5 Ann. Cas. 498, 70 L. R. A. 503, 104 N. W. 443], it is said: ''One who maintains dangerous instrumentalities or appliances on his premises of a character likely to attract children at play, or permits dangerous conditions to remain thereon with the knowledge that children are in the habit of resorting thereto for amusement, is liable to a child *non sui juris* who is injured therefrom, even though a trespasser.''

[1] In this case the proof is wanting in nothing to bring it within the doctrine as stated in the foregoing definitions. It cannot be held that the jury's implied finding that defendant's train was an attractive instrumentality is unwarranted. Certainly a little boy, accustomed to seeing the train move back and forth daily, would be tempted to steal a ride on the slowly moving cars, with those in charge out of sight and there being little danger, therefore, of discovery, and even if discovered, ''everybody knew Jim Beach, and Jim is a man who is very easy-going.'' Without any additional expense, the defendant could have stationed its brakeman in a position where the cars and the track ahead would have been under his observation instead of permitting him to sit idly upon the dago while the train was being.

backed blindly up the grade. Plainly the engineer and brakeman did not exercise ordinary care in their operation of the train. Whether ·Sulo was sufficiently advanced in years and intelligence to be classed as a willful trespasser and to foresee and comprehend the danger of going about and upon the moving cars, as in case of an adult person, was a question of fact to be determined by the jury. (*Cahill v. Stone & Co., supra.*)

[2] Appellant says: "There was absolutely no evidence to show how Sulo got under the wheels, or how he happened to be at the place where the accident occurred. . . . No living soul knows whether he was walking, lying or playing on the track or trying to crawl under the car to ride on the trucks." This line of argument would have weight in a case of injury to an adult but can have no application where an immature child has been allured into danger to his injury by the negligence of a defendant. There is ample evidence to justify the inference that the boy was injured while playing upon or about the moving car and that he would not have been there but for the failure of defendant to exercise ordinary care in the discharge of its duty to childhood. Under such circumstances the particular manner in which the accident occurred is deemed unimportant.

[3] Appellant contends that "the doctrine of the attractive nuisance cases does not extend to railroad cars, certainly not when in motion." As applied to ordinary cases this contention may be conceded. In the case of *Allred v. Pioneer Truck Co.,* 179 Cal. 315 [176 Pac. 455], where a boy was injured while trying to climb upon a truck which was being driven forward in the ordinary way, it was contended that the defendant's failure "to place its men in a position where they could at all times inspect all parts of the vehicle it was operating" was negligence. The court said: "The proposition advanced, carried to its logical conclusion, would mean that the driver of an automobile or other vehicle whose duty requires him to observe the road along which he is traveling and attend to his motive power, must be Argus-eyed or accompanied by outriders charged with the duty of seeing that small boys do not find lodgment upon the running-boards or other parts of the vehicle or approach, a position of danger where they may, as in this case, fall under a wheel. The law does not impose such

duty on one lawfully operating a vehicle along a public street.'' The facts of the instant case are unlike those in the case cited. The train was not moving forward in the ordinary way, so that the engineer would naturally see any person on or about the track, but was being backed very slowly, the end of the car farthest away being nearly a hundred feet from the positions of the engineer and brakeman, neither of whom could see the cars or the track in the direction in which they were going, and the duties of the brakeman, at least, not being such as in any manner to prevent his keeping the cars and track under his observation. These facts are similar, in principle, to those of the case of *Skinner v. Knickrehm*, 10 Cal. App. 596 [102 Pac. 947], in which a judgment for damages was affirmed. In that case the defendants caused a wagon to be attached to the rear of a very slowly moving house on the public street. The wagon was left unguarded and unattended and thereby became and was attractive to young children. A child climbed upon the wagon and was thrown therefrom by the jolting thereof and injured. It does not appear to be material whether the attractive instrumentality is stationary or moving, unless the movement thereof be such as to exclude it from the terms of the doctrine. The doctrine was first applied in this state in the case of *Barrett v. Southern Pac. Co.*, 91 Cal. 296 [25 Am. St. Rep. 186, 27 Pac. 666], a turntable case. It has since been applied as follows: *Cahill v. Stone & Co., supra*, a push-car left standing on a street-car track; *Pierce v. United Gas & Electric Co.*, 161 Cal. 176 [118 Pac. 700], leaving loose guy-wire in such position that it could be brought into contact with live wire; *Skinner v. Knickrehm, supra*, slowly moving wagon unattended; *Faylor v. Great Eastern Q. Min. Co.*, 45 Cal. App. 194 [187 Pac. 101], leaving open stope in the floors of a mining tunnel. ''The rule, of course, is not to be confined to turntables, but applies to any attractive and dangerous machinery.'' (*Cahill v. Stone & Co., supra; Pierce v. United Gas & Electric Co., supra.*)

[4] Appellant contends that the court erred in instructing the jury. As to the general objection that the court applied the doctrine of the turntable cases, nothing further need be said. The plaintiff requested the court to instruct the jury as follows: ''If you find by a fair preponderance of the evidence that Sulo Sandberg, whose age was eight

years, eight months and fifteen days when the accident occurred, was possessed of a judgment too immature to appreciate the danger in his climbing, riding and playing upon said cars, then I charge you that it was the duty of the defendant corporation to have exercised reasonable care to prevent his so doing, *providing that you find that such cars would attract an ordinarily reasonable boy of his age and that Sulo was so attracted thereto.*" The court struck out the italicized words and gave the proposed instruction as so modified. As so given the instruction is erroneous. It makes the defendant liable whether the cars were attractive to children or not. In the preceding instruction, however, the court had stated that if the defendant "ought reasonably to have anticipated that the operation of the trains operated by it would entice a child of immature years, without appreciating the danger therein, and induce him to climb, ride or play thereupon, then said corporation must be held to have anticipated that such child would be so attracted," and that if the jury further found that Sulo was so enticed and did enter upon such cars and that by the exercise of reasonable care the defendant could have prevented the child from going upon the cars and failed to do so it was negligent. In a subsequent instruction it is stated that if the engine and cars were attractive to children, that defendant knew that children frequented the place where they were operated, and that Sulo "was a child of such immature judgment that he did not know the danger of being upon or about said cars, and that he was at the time of the accident attracted to said cars," the child was not negligent. In view of all the instructions given and the almost conclusive character of the evidence tending to show that the train, as operated, was attractive to children, it is not believed the defendant suffered any prejudice from the instruction of which complaint is made.

[5] It is contended that the court erred in giving the following instruction: "If the plaintiff is entitled to recover, his recovery must be based upon the pecuniary loss suffered by himself and wife through the loss of their child. In determining the extent of this loss, you are entitled to consider the detriment suffered by plaintiff and his wife in being deprived of the services, society, comfort and protection of their son, if any." The objection urged is that the instruc-

tion tells the jury that the husband is entitled to recover for the pecuniary loss suffered by the wife. The proceeds of the judgment is community property and includes the loss suffered by both the father and mother of the child. (*Keena* v. *United Railroads of San Francisco*, 57 Cal. App. 124 [207 Pac. 35].) The husband has the management and control of the community property. The instruction was a correct statement of the law.

Most of the instructions given at plaintiff's request are attacked and it is urged that the court erred in refusing a large number proposed by defendant. It would unduly and unnecessarily lengthen this opinion to discuss them all. They have all been carefully examined and it is believed that there is no prejudicial error in any ruling of the court relative thereto.

The judgment is affirmed.

Hart, J., and Plummer, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on April 19, 1924, and the following opinion then rendered thereon:

THE COURT.—In their petition for a rehearing appellants reargue the question of the right of a husband to recover for the pecuniary loss suffered by his wife by reason of the death of their minor child. Section 376 of the Code of Civil Procedure provides: "A father, or in case of his death or desertion of his family, the mother, may maintain an action for the injury or death of a *minor* child, and a guardian for the injury or death of his ward, *when such injury or death is caused by the wrongful act or neglect of another.* . . . " Section 377 provides: "When the death of a person *not being a minor* is caused by the wrongful act or neglect of another, his heirs or personal representatives may maintain an action for damages against the person causing the death. . . . " These sections appear in title III of part II under the heading "Parties to Civil Actions." The various sections under this title relate primarily, though not exclusively, to matters of procedure, as indicated by the heading. Section 11 of the Practice Act was identical in language with the foregoing provisions of section 376 which

are not italicized. (Stats. 1851, p. 52.) In *Kramer* v. *Market St. R. R. Co.,* 25 Cal. 435, it is said: "The eleventh section of the Practice Act . . . does not create a right of action where none existed before, but merely designates the persons by whom an action, for the causes therein mentioned, which then existed or might thereafter be created by statute, should be brought." There was no right of recovery at common law for the wrongful death of a person. The first substantive law in this state imposing a liability upon a person for wrongfully causing the death of another and giving a cause of action for damages therefor was enacted in 1862. Section 1 thereof provided: "Whenever the death of a person shall be caused by wrongful act, neglect, or default, and the act, neglect, or default, is such as would (if death had not ensued) have entitled the party injured to maintain an action and recover damages in respect thereof, then, and in every such case, the person who, or the corporation which, would have been liable if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances as amount in law to felony." (Stats. 1862, p. 447.) In adopting the codes in 1872, section 11 of the Practice Act was re-enacted *verbatim* as section 376 of the Code of Civil Procedure and section 377 was enacted in the language quoted herein, except that the italicized words were not included. In 1874 the italicized words appearing in both sections were added thereto. In *Benjamin* v. *Eldridge,* 50 Cal. 612, it is said that sections 376 and 377 are substantially a re-enactment of the statute of 1862 and that, under the provisions of section 5 of the Code of Civil Procedure, they must be construed as continuations of that statute, and not as new enactments. In *Bond* v. *United Railroads,* 159 Cal. 270, 281 [Ann. Cas. 1912C, 50, 48 L. R. A. (N. S.) 687, 113 Pac. 366, 370], after pointing out the peculiar provisions of section 376, it is said: "These anomalies show that section 376 was not carefully or skillfully drawn and suggest that caution is necessary in its construction and application." The statute of 1862 has never been expressly repealed. Much of the uncertainty pointed out in the Bond case would be overcome by holding that the statute of 1862 still constitutes the substantive law relative to the subject under discussion, except as repealed

by necessary implication, and that sections 376 and 377, in so far as they relate to parties plaintiff, were intended to affect the procedure merely. It is not necessary, however, to so hold in order to affirm the judgment. An examination of the provisions of section 376, viewed in the light of the history of legislation upon the subject matter embraced therein, discloses a legislative intent to give the marital community a right of action for the death by wrongful act of a minor child. What is recovered in such a case is community property and therefore the husband, who has control of the community property, is authorized to maintain the action. If the community is destroyed by the death or desertion of the husband, then the wife may sue. In *Simoneau* v. *Pacific Electric Ry.,* 159 Cal. 494, 508 [115 Pac. 320, 327], in considering a case arising under section 377, it is said: "It is not intended that the amount recovered shall be divided into integral or proportional parts. The persons entitled do not take as heirs or by succession, but as beneficiaries of the statute; 'the statute being framed upon the theory that the heirs will always constitute the family of the deceased.'" In *Robinson* v. *Western States Gas etc. Co.,* 184 Cal. 401, 410 [194 Pac. 39, 43], after quoting the foregoing language of the Simoneau case, it is said: "The verdict should have been given for a lump sum to all the plaintiffs, including, of course, the damages to each of them." [6] It may be said, with equal reason, that section 376, in so far as it authorizes the husband to maintain an action for the death of a minor child, is framed upon the theory of the continuance of the marital community and that the husband is the representative thereof for the purpose of maintaining the action. There was no necessity of joining the wife as a party plaintiff. "A person expressly authorized by statute, may sue without joining with him the persons for whose benefit the action is prosecuted." (Code Civ. Proc., sec. 369.)

The petition is denied.

A petition by appellants to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 19, 1924.