[Civ. No. 17. Fourth Appellate District.—December 4, 1930.]

REFUJIO HERNANDEZ, Appellant, v. SANTIAGO ORANGE GROWERS' ASSOCIATION (a Corporation), Respondent.

William P. Webb for Appellant.

Kidd, Schell & Delamer for Respondent.

BARNARD, J.—This is an action for damages for the death of the minor son of the plaintiff. At the close of plaintiff's evidence, a motion for a nonsuit was granted by the trial court, and from the judgment which followed, this appeal is taken. The facts are not disputed and the only question presented is whether or not the case falls within the scope of the attractive nuisance doctrine.

Briefly stated, the facts are as follows: For more than eleven years prior to August 29, 1929, defendant had operated a plant in the city of Orange, California, situated along the tracks of the Santa Fe Railroad. As a part of its business, defendant iced refrigerator-cars as they stood upon the railroad track. This was done by means of an ice-loading platform about eight feet in width and eighty feet in length, and a chute leading from the platform to the top of the cars. There was a space of about three and one-half feet between the platform and the side of the car, and the platform was a few inches higher than the top of the car. The defendant had built a fence around the outer edge of the platform to keep the ice from falling off. In the process of icing cars, blocks of ice weighing about three hundred pounds each were moved along this

loading platform to a point opposite the opening in the top of a car, where a gate in the fence was raised, and the ice taken to the car over a chute or trough about five feet long and two and one-half or three feet wide, with side rails upon it. The ice was moved along this chute by means of a large pair of tongs suspended from a block and tackle. At the opening into the top of the car the blocks of ice were broken into thirds for the purpose of compact loading. As a result of breaking the blocks of ice into thirds, small pieces of ice broken off would frequently fall into the space between the car and the loading platform, or upon the farther side of the car. Quite frequently such pieces of ice would weigh twenty-five pounds or more. On two occasions during the eleven years, a whole block of ice slipped from the control and fell to the ground. It was the second time this occurred that gave rise to this action. On August 29, 1929, a cake of ice slipped and fell to the ground between the cars and the platform striking the minor son of plaintiff, and causing injuries from which he later died. At that time the boy was nine years, nine months and twenty-six days old.

It was the custom of children of all ages from seven to twenty, a number of whom lived near the plant, to collect almost daily on the railroad right of way. As to what these children did there, the record shows the following: "They would gather on the railroad right of way and would keep their distance, and the first opportunity they had they would dart in and get those little chunks of ice." "They would be standing along the track away from the cars until ice would drop down and then they would jump for it and grab for it." One witness testified that the children were not playing; that they were sitting or standing around the railroad track, and would pick up ice. Another witness, in response to a question as to what these children usually did while there, testified: "They gather right near the freight cars and watch pieces of ice fall from the top of the cars, and then when they had a chance pick it up and put it in the little cart and took it home." This same witness testified that he had seen the boy who was killed load such ice in his wagon and take it home; that he had been doing this for some time. Later, he testified that he saw the boy carry the ice away from the premises, but did not know whether he used it himself or where he took it.

The defendant's employees, who were loading the cars, knew of this custom of the children in the neighborhood, and were all instructed to keep the children away. The evidence shows that children were chased away by employees on innumerable occasions; that the defendant had a standing complaint with the chief of police asking that the children be kept away from there; and that it was a usual practice for police officers to call and chase the youngsters away. One of the men who was helping to ice the car at the time the boy was hurt, testified as follows: ''Q. You had not seen the boy around there before the accident, had you? A. No, there hadn't been any children around that day. Q. And you had been keeping watch to see that they kept away from there? A. Well, we kind of kept watch on them all the time because we would have to if they would run up under the cars. Q. What? A. They would sneak under the cars and every other way to get ice. Q. What would you do when you would see them there? A. We would chase them away.''

Another witness testified that during the summer of 1929 he saw the employees of defendant chasing the boys away on three or four occasions. There was evidence that the boy who was killed had been thus warned and driven away. The defendant's loading foreman testified that he did not see the deceased around the plant on the day he was killed, prior to the accident; that he had previously seen him around on from six to ten different occasions; that he had told him to get out of there because it was dangerous while they were working; and that some three days before the accident, he pulled the boy by the arm from between the car and the loading platform, and then went back and got his little cart and took it to him, telling him to keep out. The boy's father testified that he had not given his consent or permission to visit these premises; that every time he found he had been there he reprimanded him for it; that he scolded him because it was dangerous; that the boy would promise he would not return there; that he told him not to go to the plant because he knew there was danger of his being crushed; that he did this on at least two occasions, the last one a little more than a week before the boy was hurt; and that these warnings were in Spanish and the boy understood them. The boy's

mother testified that she scolded him for going there, and that sometimes she went over and brought him back and whipped him for going.

The only question involved in this appeal is whether this case comes within attractive nuisance rule, an exception to the general rule that a defendant is not liable for injuries sustained by a trespasser upon his premises. (*Peters* v. *Bowman*, 115 Cal. 345 [56 Am. St. Rep. 106, 47 Pac. 113, 598, 599].) As was said by Chief Justice Beatty in the case just cited: "The owner of a thing dangerous and attractive to the children is not always universally liable for an injury to a child tempted by the attraction. His liability bears a relation to the character of the thing, whether natural and common, or artificial and uncommon, to the comparative ease or difficulty of preventing the danger without destroying or impairing the usefulness of the thing, and, in short, to the reasonableness and propriety of his own conduct, in view of all surrounding circumstances and conditions. As to common dangers existing in the order of nature, it is the duty of parents to guard and warn their children, and, failing to do so, they should not expect to hold others responsible for their own want of care. But, with respect to dangers specially created by the act of the owner, novel in character, attractive and dangerous to children, easily guarded and rendered safe, the rule is, as it ought to be, different; . . ."

Originally, the attractive nuisance doctrine was applied only to machinery under certain circumstances, but in this state its application has been extended to various appliances and contrivances. Certain conditions, however, are uniformly held to be essential to bring a case within the doctrine.

"The contrivance must be artificial and uncommon, as well as dangerous, and capable of being rendered safe with ease without destroying its usefulness, and of such a nature as to virtually constitute a trap into which children would be led on account of their ignorance and inexperience. The principle of the rule having been recognized and firmly established in this state, it has been applied to a variety of machines, appliances and contrivances coming within this definition." (Citing cases.) (*Morse* v. *Douglas*, 107 Cal. App. 198 [290 Pac. 465].)

. In *Giannini* v. *Campodonico*, 176 Cal. 548 [169 Pac. 80, 82], the court said: "Moreover, it is an essential ingredient

of a cause of action to which the 'turntable cases' doctrine applies that the minor should have been attracted to the premises by a childish curiosity and desire to play thereon.''

In the instant case, it is not contended that the instrumentality itself, the loading equipment, was dangerous or attractive, or that boys in general or this boy in particular were attracted by it. The complaint and all of the evidence shows that the boys were not attracted by any contrivance, but by the ice itself. The only danger that appears is the danger of being hit by falling ice while the loading facilities were being used. The loading of all kinds of heavy objects is common. The falling of such objects is in the regular order of nature, and danger from the same is always present wherever this process is carried on any distance above the ground. So far as we know, the attractive nuisance doctrine has never been applied to the danger incident to ordinary loading operations. Every place where such operations are carried on has some danger in it; in fact, such work cannot be carried on without some element of danger. Not only was the contrivance used here a common one, and one that did not arouse the childish curiosity and desire for play of these children, inexperienced or otherwise, but the danger involved, the danger from the falling of heavy objects, was a natural and common danger. Even young children very early realize such a danger. Not only may it be presumed that normal children of about ten years of age would understand such a natural and common danger, but actual knowledge here appears. The evidence is uncontradicted that all of the boys who had been around these premises did not remain between the car and the loading platform, but stayed away, sitting or standing on the railroad tracks; that they watched the pieces of ice fall; and watched their chance to dart in and obtain the same, even at times sneaking under the cars for the purpose. The evidence also shows that the boys in general were frequently warned of the danger, and that this particular boy had not only been warned, even to the extent of being whipped, but had promised to stay away. As was said in *Faylor* v. *Great Eastern Q. Min. Co.*, 45 Cal. App., at page 202 [187 Pac. 101, 104], in speaking of the danger existing in an artificial pond of water, ''the danger was not a concealed danger and the children from birth

are taught, generally speaking, to avoid the danger of drowning, at least when the danger is open to their eyes''. In the instant case, the children were not only so taught, but the danger was both open to their eyes and frequently seen. In such cases where the danger is so open and obvious that the children must have seen it, our courts have refused to apply the doctrine of attractive nuisance. (*Peters* v. *Bowman, supra; Loftus* v. *Dehail,* 133 Cal. 214 [65 Pac. 379].)

Not only did these children, including the deceased, know the danger, having watched the ice fall, but they were not attracted by the childish curiosity and desire to play which gave rise to the doctrine relied on. They were attracted by the ice, a by-product of the work carried on. This is alleged in the complaint, and conclusively shown by the evidence. They were not playing, but were getting something. All of the evidence is to the effect they carried the ice away in little wagons. Whether they took it home or otherwise disposed of it, and even though it may be said that the ice having been discarded was not being purloined, there can be no doubt that they were appropriating it, and that there was a little more to their actions than the playful sport of children. While the attractive nuisance doctrine has been rather liberally extended in this state, it has never been extended from machinery or a contrivance to such an attraction as food or fruit or ice. If the attraction, which constitutes the fundamental part of the exception, were thus extended, an intolerable burden would be added to business.

Nor can it be said that these loading operations were capable of being rendered safe with ease without destroying their usefulness. As was said in *Peters* v. *Bowman, supra,* ''A turntable can be rendered absolutely safe, without destroying or materially impairing its usefulness, by simply locking it. A pond cannot be rendered inaccessible to boys by any ordinary means.'' These railroad tracks could not have been locked or fenced. The record shows that respondent had taken unusual precautions, far in excess of those usually taken in icing cars, to prevent ice from falling. This, with the rather unusual efforts shown to have been made by employees and police to drive the boys away, and the testimony to the effect that the boys would keep their distance along the railroad tracks and dart in

suddenly, and even crawl under the cars, discloses not only a situation not easily rendered safe, but one involving a well-known tendency of young boys quite different from that mere display of childish curiosity which may, through ignorance and inexperience, lead them into a dangerous situation they do not understand. ■ We think the evidence here fails to show that the deceased was too young and inexperienced to appreciate the danger he was running into, and fails to show that he was incapable of contributory negligence. (*Bradley* v. *Thompson*, 65 Cal. App. 226, at 232 [223 Pac. 572].) The appellant admits that he knew of the danger in having his child around the ice-loading plant here in question. If he took sufficient steps to warn his child of that danger, the child was aware of it and the doctrine of attractive nuisance did not apply. On the other hand, if he did not sufficiently warn the child, his own negligence bars his recovery.

■ Appellant argues that the question whether respondent exercised ordinary care in taking precautions to keep the children away from the dangerous situation existing, is a question of fact to be left to the jury. However, the burden first rests upon appellant to show that his case comes within an exception to the general rule. The facts being undisputed, it is a question of law whether or not the facts shown bring the case within the exception. (*Nicolosi* v. *Clark*, 169 Cal. 746 [L. R. A. 1915F, 638, 147 Pac. 971].)

The judgment is affirmed.

Cary, P. J., and Marks, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on January 2, 1931, and a petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on February 2, 1931.